**CJP CONTRACTORS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 95–126C, 95–786C.**

United States Court of Federal Claims.

Nov. 19, 1999.

Russell S. Gill, Biloxi, MS, for plaintiff, Marilyn H. David, of counsel.

Laureen Kapin, U.S. Department of Justice, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, Assistant Director Kirk T. Manhardt, for the defendant, Kathy McCartney, General Services Administration, of counsel.

## OPINION

FIRESTONE, Judge.

The present consolidated actions were brought pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1994). The contractor, CJP Contractors, Inc. ("CJP"), was default terminated before the contract's completion date for failure to make progress. In this action, CJP is seeking to convert the termination for default into a termination for the convenience of the government. Defendant, the General Services Administration ("GSA"), argues that the termination for default should be upheld and is seeking $917,539.62 in excess reprocurement costs, administrative expenses, and liquidated damages arising from its termination decision. Trial in this matter was held in Washington, D.C., from July 12 to July 23, 1999. For the reasons that follow, the court finds that the termination for default decision is not sustainable and must therefore be reversed.

## I. BACKGROUND FACTS

### A. Contract Requirements and Award

On July 23, 1993, GSA solicited bids for fixed-price contract No. GS–11P93MK0081 for the replacement of the heating system at the GSA storage depot in Springfield, Virginia. The contract required, among other things, the contractor to install the piping needed for a new gas-fired heating system, remove and demolish the storage facility's existing oil-based heating system, and install the new gas-fired industrial furnaces and ac-

companying duct work. The contract divided performance into two phases. Phase A of the contract required the contractor to install and energize the new gas piping at the six buildings [1] that make up the storage depot before beginning work on Phase B. Phase B required the contractor to demolish and dispose of the existing oil-fired heating units and then replace those units with the new gas-fired furnaces. Only after the new units were functioning would the contractor be authorized to dismantle and dispose of the existing heating oil-lines and oil storage tanks.[2] Under the terms of the contract, Phase A was to be completed within 170 days of the notice to proceed, and Phase B was to be completed within 310 days of the notice to proceed.

On August 20, 1993, CJP submitted the low bid on the contract.[3] In fact, CJP's bid of $632,300 was 28% below the government's $878,300 estimate for the work and 21% lower than the average of the next two lowest bids. Concerned about the accuracy of CJP's bid, Joy Walker, the Contracting Officer ("CO") for GSA,[4] requested that CJP verify its bid before making an award. CJP confirmed its bid and was awarded the contract on September 23, 1993.[5]

B. Phase A—Disputes and Delays in Connection with Installation of the New Gas Pipeline and Procuring the Replacement Gas-fired Units.

From the beginning of the project, the relationships between Paul Tully, CJP's president, and GSA's on-site representatives, William ("Bill") Henry, the construction engineer, and Stephen Disselkoen, the construction quality manager, were strained.[6] It was clear from Mr. Disselkoen's testimony that he and Mr. Henry believed that CJP did not have the right crew, equipment, or attitude

1. The storage facility consists of 6 buildings, A, B, C, D, 1, and 8, and a pump house, which together cover 1.3 million square feet. Of the six buildings covered by the contract, the work was focused primarily on converting the heating system in the two large warehouses, Buildings A and B. Building A is the largest of the warehouses. It is the size of 20 football fields and is made of concrete with wood ceilings 17 to 27 feet high. Building B, the next largest warehouse, is the size of 5 football fields.

At the time of the contract, one of the nation's intelligence services was using a section of the facility. As a result, a small portion of Building A and the remainder of the storage facility was a restricted area, and GSA required CJP to follow strict security procedures. CJP's president's failure to comply fully with those security procedures would later become an issue between the parties.

2. According to Francis Woods, the engineer in charge of the CJP contract and author of the contract's specifications, GSA decided to replace the old oil-fired heating units because of environmental concerns arising from leaking underground oil storage tanks at the site. The existing system apparently was still functional. Moreover, Mr. Woods explained that each of the buildings was heated separately and that within the large buildings the units operated independently from each other, such that the buildings could be heated with a combination of both oil and gas heat if necessary.

3. CJP had been awarded 223 previous government contracts. Prior to the GSA contract, CJP apparently had not encountered any serious problems in meeting its contract obligations.

Subsequently, CJP paid liquidated damages in the amount of approximately $10,600 for delays in meeting contract deadlines.

4. The CJP contract was Ms. Walker's first contract as a CO. Her supervisor on this project was Mr. Jesse Bowen, who also served as the Alternate Contracting Officer. Mr. Bowen had the same authority as Ms. Walker. Only Ms. Walker testified at trial, however, as Mr. Bowen was not available due to ill health.

5. Although CJP verified its bid, it had, in fact, erred in preparing the bid. CJP failed to include approximately $65,000 for the material and labor associated with the purchase and installation of the breeching needed for the project. CJP's bid error became a factor in the CO's decision to terminate CJP.

6. Mr. Henry was never deposed and did not testify at trial due to health problems. Mr. Disselkoen, a GSA contract employee who was responsible for the day to day operations of the project site, served as the defendant's chief witness regarding CJP's daily performance. Mr. Disselkoen is an electrician by trade and before this contract had never worked on any projects involving gas piping and had only "minor" experience with welding.

CJP contended throughout this litigation that Mr. Henry was biased against CJP and that this bias is what ultimately led to CJP's termination. The court, however, rejected evidence suggesting possible corrupt activity where the information previously had been made available for investigation by the Department of Justice.

for the job. Mr. Disselkoen's testimony throughout the trial reflected his view that CJP never properly performed the contract. Problems between CJP and GSA began with concerns over CJP's delay in getting started with Phase A.

## C. The Gas Meter Details

After receiving the contract award, CJP, in accordance with the contract, submitted a bar chart progress schedule to GSA that established a time line for each of the major project tasks.[7] CJP's November 29, 1993 schedule indicated that CJP would start work on January 4, 1994. CJP did not, however, mobilize to the site on that date. Instead, by letter dated December 27, 1993, CJP notified GSA that it would not be able to begin work on January 4, 1994. The letter informed GSA that the weeks of January 3, 1994, January 10, 1994, and January 17, 1994, CJP would be in Georgia working on other government jobs. Despite this change in schedule, the letter went on to assure GSA that CJP would begin work on January 24, 1994, and would establish a "rigid" schedule. Further, the letter stated that CJP's "delay in starting work on site will not delay completion of the project."

While acknowledging the delay, Mr. Tully wrote further:

> It is our hope that this delay in starting will allow you to provide the connection details at the Gas Meter in Bay 4B. As discussed, we need to confirm that 14″ off the wall to the center of the 8″ pipe is acceptable to the Gas Company and the elevation above the floor for the 8″ Flange we will provide on the 8″ main to connect to the meter.

At trial Mr. Tully explained that even if CJP was not delayed by other ongoing contracts, CJP could not have started work on the GSA project because of GSA's failure to provide CJP with certain essential details of the project. Specifically, Mr. Tully stated that in order to begin installing the gas piping he needed to know where the gas meter for the Washington Gas Company would be set so he could determine how far off the wall the pipe should be installed. Mr. Tully stated that he needed this information in order to fabricate the brackets that would support the pipe. Mr. Tully explained that for efficiency purposes he planned to use the same size brackets for all of the piping, and as a result, he needed to know how far off the wall the meter would be set before CJP could begin to hang any of the piping.

When he failed to receive a response from Mr. Henry, Mr. Tully sent Mr. Henry a letter on January 6, 1994, stating that CJP intended to install the pipe 14 inches off the wall. Mr. Henry's response to the letter is contained in a handwritten note at the bottom of the letter stating, "I advised Paul not to fabricate any material based on any understanding that the pipe will be 14″ off the wall. The meter is scheduled to be set the week of 1/10/94." Mr. Tully testified further that he notified Mr. Henry that because CJP could not begin the job without the gas meter details, CJP intended to work on other jobs during the early part of January. Mr. Tully stated that Mr. Henry told him that he "saw no problem" with this plan. After receiving the gas meter details on January 13, 1994, Mr. Tully ordered the brackets. Once the brackets were available, CJP started work on February 7, 1994.

At trial Mr. Francis Woods of Summer Engineering, the architect/engineer ("A & E") for this project, testified that CJP's contention that it needed the gas meter details to begin work was not supported because CJP could have used adjustable standard brackets to hang all of the gas piping. Ac-

---

**7.** Mr. Disselkoen testified that although CJP submitted various "schedules" throughout the project period none of the schedules was sufficiently detailed to allow him or Mr. Henry to fully track CJP's performance. Mr. Henry complained to the CO that CJP had not provided the required schedules to GSA. This eventually led to a discussion between Mr. Tully and the CO, who upon learning that CJP had in fact provided and updated several bar schedules, agreed that CJP did not have to provide the type of detailed schedule Mr. Henry had wanted. As discussed *supra*, it became clear throughout the trial that on several matters, similar to the discussion regarding schedules, the CO was not told the whole truth about CJP's performance by her on-site representatives and that the CO's unchecked reliance on her staff led to the expensive decisions now at issue in this case.

cording to Mr. Woods, the final connection to the gas meter could wait until the meter was set without impeding the progress of the gas pipe installation. As a result, Mr. Woods concluded that the gas meter details in no way delayed CJP's start date.

Mr. Christopher Gilley, plaintiff's expert witness,[8] disagreed with Mr. Woods's contention that CJP did not need the gas meter details, but concurred with Mr. Woods that CJP had not established the right to more time based on the delay in receiving the gas meter details. This view was reiterated by another of plaintiff's expert witnesses, William Powell, the city engineer of Gulfport, Mississippi,[9] who stated that the government's delay in providing the gas meter details ran concurrently with Mr. Tully's decision to work on other jobs during this same period. Thus, he could not assign any government delay to this period.

### D. Late Submittals and the February Cure Notice

Shortly after CJP began work at the site CJP and GSA began arguing over the timeliness of CJP's equipment submittals. Section 1.03 of CJP's contract called for CJP to submit equipment shop drawings for approval by the A & E firm within 30 days of the notice to proceed. By obtaining the A & E firm's approval in advance, GSA—not CJP—would assume the risk that the equipment ordered would meet the contract's specifications. Mr. Tully explained that where A & E approval is required, the equipment supplier

prepares the drawings for approval. Mr. Tully further explained that he saw his job as simply passing on the relevant information to the A & E firm.

In September 1993, in advance of the notice to proceed, CJP contacted the equipment suppliers GSA recommended to place preliminary orders for the 26 heaters, 3 boilers, and 2 conversion units that had long-term delivery dates. According to Mr. Tully, he did not rush to have the suppliers provide any drawings because he did not want the equipment delivered too early. Mr. Tully explained that he told Mr. Henry that he was going to delay the shop drawing submittals to the A & E firm so that equipment deliveries did not arrive until needed. Mr. Tully further explained that he had no place to store all of the heating units on site and that on past contracts he had run into problems with equipment being damaged due to improper storage. Mr. Tully stated that he discussed his approach with Mr. Henry who, Mr. Tully believed, concurred in his approach. Mr. Henry's subsequent actions indicated, however, that Mr. Tully was mistaken.

On February 7, 1994, Mr. Charles Walters, the CO's representative at GSA headquarters,[10] issued a cure notice to CJP addressing CJP's failure to submit timely shop and coordination drawings. The cure letter stated that

> sixty two (62) percent of the contract duration time has elapsed for Phase "A" of the contract and your firm has failed to per-

---

8. Mr. Gilley is a mechanical engineer, whose extensive experience includes his work in "Critical Path Method" schedule analysis, piping systems analysis, HVAC, and claims preparation and analysis. The court accepted Mr. Gilley without objection as an expert in these areas. Additionally, Mr. Gilley also has worked as a process control engineer at General Electric Co.'s welding shop, where he was responsible for quality assurance and quality control. After voir dire, the court also allowed Mr. Gilley to express opinions regarding how a mechanical engineer would evaluate whether a pipeline meets certain specifications and how the evaluation of welds fits into that determination.

9. Mr. Powell has more than 24 years of service as an engineer administering construction projects in the Navy, with the Army Corps of Engi-

neers, and as the city engineer in Gulfport, Mississippi. The court accepted Mr. Powell without objection as an expert in the fields of delay analysis and costing of government contracts.

10. Mr. Charles Walters currently is a deputy division director for a surface support delivery division with GSA. During the time of the CJP contract, Mr. Walters was the contracting officer's representative assigned to handle all the projects on the south side of Washington, Maryland, and northern Virginia. His responsibilities included overseeing all the projects within his jurisdiction, which he estimated at approximately one hundred a year, and supervising a staff of approximately twenty construction engineers and ten contract employees, such as Mr. Disselkoen. Mr. Walters has been with GSA for twenty-nine years.

form any work at the job site. Thirty three (33) percent of the contract duration time has elapsed for Phase "B" of the contract and your firm has failed to perform any work at the job site.

The letter directed CJP to cure the submittal deficiency within ten days and warned that termination for default was a possibility. Mr. Walters testified that GSA was concerned with CJP's late submittals because he understood from his own experience that some of the equipment could take up to five months to fabricate.

On February 18, 1994, Mr. Tully responded to the cure letter, assuring GSA that he was "diligently pursuing acquisition of all submittal data" and declaring that it was his "number one priority." Mr. Tully also stated that the "completion dates for each phase will not be affected by late submittals."

Thereafter, Mr. Tully began submitting the required shop drawings to the A & E firm for approval. In this connection, the submittal log indicates that the A & E firm approved the submittals for the 23 heating units needed to heat all of Building A and portions of Building B on February 10, 1994. Installing these units amounted to over 90% of the contract. The submittals for the boilers and duct furnaces did not go as smoothly. The drawings for the three boilers were not finally approved until May 19, 1994, and the drawings for the three duct furnaces were rejected several times and not approved until June 13, 1994. The boilers and the duct furnaces were needed for portions of Buildings B, D, and 1.

The parties never fully identified the precise reasons for CJP's problems with the submittal process. Mr. Woods testified that although it was not unusual for a contractor to rely on the supplier to prepare the submittals for important pieces of equipment, CJP's problems stemmed from its failure to review adequately the submittals prepared by the equipment suppliers. Mr. Woods testified that contractors need to take the submittals from the suppliers or vendors and annotate and consolidate them for review by the A & E. Mr. Woods stated that CJP's submittals often were rejected due to CJP's failure to annotate the submittals. Mr. Woods testified that there was a particular problem with the drawings for the temperature controls that were part of the heating units. He indicated that Mr. Tully's belligerent attitude toward correcting the problem typified CJP's overall lack of cooperation in completing the submittal process. Mr. Tully testified in response that Mr. Woods's firm was unduly critical [11] and that most of the issues stemmed from problems with CJP's suppliers and not CJP.

As discussed in greater detail, *infra*, Mr. George Strickler, GSA's expert,[12] testified that CJP's delay in getting all of its submittals timely approved was at the core of its performance problems. In Mr. Strickler's view, CJP's delay in getting the submittals approved for the boilers and duct furnaces kept CJP from complying with Phase A of the contract, which Mr. Strickler read to require CJP to have all equipment on site before starting on Phase B. The contract states:

*PHASING*

1. General: Perform all work of Phase A complete prior to beginning work of Phase B.

2. Phase A:

---

11. For example, in connection with the problems over the temperature controls, Mr. Tully argued at trial that the submittal process for the temperature controls was a "duplication of what had already been submitted and approved...." Mr. Tully explained that the approved submittals for the equipment that contained temperature controls already addressed those controls. Thus, according to Mr. Tully, "what we had to do was extrapolate the information from the previously submitted submittal information, and repackage it and send it again under another submittal, but it had already been approved." Mr. Tully noted further that the delays in these submissions did not delay any critical path activity because the equipment in which the thermostats were being used was either already on site or being shipped.

12. Mr. Strickler is a civil engineer and currently is a partner in the firm of Capital Project Management. Mr. Strickler's experience includes his work as a project manager at U.S. Steel. The court accepted Mr. Strickler as an expert in scheduling and delay analysis and also accepted his expert testimony regarding the basis for the termination for default decision.

1. Provide gas main piping throughout Buildings A, B and D complete. Provide connection for each heater and boiler on gas main. Connection shall consist of a capped gas stop valve for phased connection to units.

2. Deliver all gas-fired heaters and boilers to project and store on-site where directed.

3. Phase B: Work shall not begin prior to March 15, 1994.

 1. When the new gas-fired heater and boiler is on site and ready for installation and gas service to the building is fully operational, then the existing oil-fired heater or boiler can be removed.

 2. Install gas-fired heaters and boilers and connect to gas connection.

 3. When all gas-fired heaters and boilers have been installed, tested, are operational and accepted, then proceed with removal of the fuel oil distribution piping and pump.

Without addressing the fact that each of the buildings at the site were heated separately and that replacing the heating units in Building A amounted to over 90% of the project, it was Mr. Strickler's expert opinion that CJP's delays in meeting the contract completion date were due solely to CJP's failure to get the boiler and duct furnace submittals approved in sufficient time to meet the August 28 contract completion date. At trial, Mr. Strickler analogized CJP's project to preparing a "Thanksgiving dinner." He explained that the timing of the dinner was driven by getting the turkey into the oven on time. In Mr. Strickler's view, having all of the equipment on site was the equivalent of having the entire turkey ready to place in the oven. Thus, he concluded, CJP's failure to have all of the heating equipment on site when it completed the gas piping was the same as not having the turkey available to cook.

Although Mr. Tully acknowledged that he had problems with getting the submittals approved for the boilers and duct furnaces, he denied that these delays interfered with his meeting the contract schedule. In particular, Mr. Tully explained that although his later schedules reflected some equipment deliveries beyond the contract completion date, he believed that he could have gotten the equipment delivered sooner. Mr. Tully stated that

> if the submittals are rejected because of a problem caused by the manufacturer in putting the [submittal] package together ... they will reduce the production time ... by sticking your order into their production line somewhere between the front and the end of it rather than putting it on the tail end, because they have a responsibility to the contractor to provide the product in a timely fashion, ... as well as the submittal data.

Mr. Tully further testified that he already was receiving feedback from his suppliers that they were going to take care of the delivery.[13] Mr. Tully also explained that he could have paid more to move up production of the equipment. Mr. Tully stated that he did not need to do this because the suppliers were responsible for the rejections.

Mr. Gilley testified that equipment delays did not interfere with CJP's ability to timely complete the contract because 1) a contractor may always pay more to move up an equipment delivery date, and 2) the delays did not interfere with CJP's progress on its critical path. As discussed in greater detail, *infra*, Mr. Gilley testified that the delays in equipment deliveries did not interfere with CJP's critical path because all of the heating units for Building A and for portions of Building B were available for installation in late May, when the gas piping was complete and the line was energized. At trial, Mr. Gilley emphasized that replacing the heating units in

---

**13.** In this connection, CJP introduced a letter from Mr. Hank Reus, of Tate Engineering Systems, Inc., the boiler supplier, which stated that Mr. Reus was ready and willing to move up production of the boilers. By letter dated June 10, 1994, Mr. Ruse showed the following shipping dates for the Cleaver Brooks and Industrial Combustion boilers: Building 1—August 19, 1994; Building B—August 26, 1994; Building C—June 27, 1994; Pump House—June 27, 1994. Mr. Ruse stated, "Please be advised that we shall continue to do our best to expedite shipment of the boilers as you are on an extremely tight schedule."

Buildings A and B amounted to more than 90% of the work on the project, and that the submittals for these units were all approved by February 10, 1994. Further, he stated that he did not read the phasing requirement of the contract to require that every conceivable piece of equipment be on site before CJP could begin Phase B. Mr. Gilley stated that this would not make sense and that he was not aware of any situation where a phasing requirement had been interpreted to stop work on the critical path. Mr. Gilley noted further that even if the phasing requirement should be construed as defendant now argues, GSA never held CJP to that reading of the contract. CJP was allowed to do work on Phase B without all of the equipment on site.

Mr. Powell also stated that he did not believe that delays in the submittal process delayed the project. He explained that a contractor always has the option of ordering equipment without approval and running the risk that the equipment will not conform to the contract. He also testified that while GSA could read the contract to require CJP to have all the equipment on site before starting Phase B, he would not read the phasing requirement to stop work on the critical path of a project.

### E. Disputes over the Proper Gas-pipe Welding Standard

Following on the heels of the submittal dispute, GSA and CJP next disagreed over the welding standard governing installation of the new gas pipeline.[14] CJP's contract identified three standards under the Natural Gas Piping specification in section 15482:

### 1.02 QUALITY ASSURANCE

A. Codes and Standards: Provide natural gas system conforming to the following:

 1. ANSI: Fabricate and install natural gas piping in accordance with ANSI (American National Standards Institute) B31.2, "Fuel Gas Piping."[15]

14. Different welding processes require different types of welders. Welders are certified for each significant type of welding activity and the more skilled the welder, the more difficult type of welding the welder is allowed to perform. Mr. Tully holds the highest welding certification. His other welders on the job, Mr. Ashley and Ms. Cudaback also were certified, but did not hold as high a certification.

15. ANSI B31.2 was rendered obsolete in 1988. In 1980, 1984, and 1988, those portions of ANSI B31.2 that pertained to fuel gas piping up to 125 psig were incorporated into NFPA 54. The relationship between the two standards is set forth in the introduction to NFPA 54. The introduction states:

> This 1992 edition incorporates changes to the 1988 edition. It was adopted by the National Fire Protection Association (NFPA) on July 17, 1992, and approved by the American National Standards Institute, Inc. (ANSI) on August 28, 1992. The ANSI designation is Z223.1–1992. The NFPA designation is NFPA 54–1992.... This *Code* offers general criteria for the installation and operation of gas piping and gas equipment on consumers' premises....
> In October 1967 representatives of the American *Gas Association, the American Society of* Mechanical Engineers, and the National Fire Protection Association met as a Conference Group on Piping and Installation Standards to consider the development of a single National Fuel Gas Code.... At a January 1968 meeting, the conference group developed the objectives and scope of a proposed National Standards

Committee. The group envisioned the combining of the following standards into a single National Fuel Gas Code:
> *American National Standard Installation of Gas Appliances and Gas Piping*, ANSI Z21.30 (NFPA 54);
> *Installation of Gas Piping and Gas Equipment on Industrial Premises and Certain Other Premises*, ANSI Z83.1 (NFPA 54A); and *Fuel Gas Piping*, ASME B31.2
> The proposed scope at that time limited coverage of piping systems to 60 psig. The National Standards Committee agreed to relinquish Z21.30 (NFPA 54), Z83.1 (NFPA 54A), and applicable portions of ASME B31.2 covering piping systems up to and including 60 psig to a new National Fuel Gas Code Committee, co-sponsored by the three Associations....
> In order to establish a National Fuel Gas Code to satisfy the immediate needs of the gas industry, at its December 6, 1972 organizational meeting the Z223 Committee combined NFPA 54–1969 and Z83.1–1972 with only those editorial revisions necessary to reflect the scope of the new *Code*. Further revisions of the *Code* would be necessary to incorporate pertinent coverage for fuel gas piping from ASME B31.2–1968....
> The second edition of the *Code*, incorporating pertinent portions of B31.2, was issued in 1980. The third and fourth editions were issued in 1984 and 1988, respectively. The scope of the *Code* was expanded in 1988 to include piping systems up to and including 125 psig.

2. NFPA: Fabricate and install natural gas systems in accordance with NFPA (National Fire Protection Association) 54, "National Fuel Gas Code."

3. Local Utility: Fabricate and install natural gas systems in accordance with Washington Gas Company regulations.

The contract also included a gas pipeline "Testing" provision:

3.06 TESTING

A. General: Inspect, test, and purge natural gas systems in the presence of the Contracting Officer in accordance with NFPA 54 and Washington Gas Company requirements and as follows:

1. Visually examine natural gas system after installation.

2. Pressure test natural gas system with dry air or nitrogen at 100 psig for 2 hours. Soap test all joints to detect leaks.

3. Flush and purge natural gas system and charge with gas in accordance with Washington Gas Company requirements and NFPA 54.

The dispute over the proper welding standard, at this time, centered over the scope of the Washington Gas Company's requirements. At issue was whether Mr. Henry's understanding that the Washington Gas Company requires gas pipeline welds to meet the standards set forth in American Petroleum Institute ("API") Standard 1104 was correct.[16]

GSA's dispute with CJP over the application of API 1104 lasted from early February until March 7, 1994, when the parties ultimately resolved the dispute in CJP's favor. As Mr. Tully testified, just as CJP was ready to start production welding on the gas pipeline, Mr. Henry advised Mr. Tully "that the Government, at our discretion, would have the steel pipe welds x-rayed to verify the quality of workmanship." Mr. Henry's meeting notes state, "Mr. Tully stated that he would submit welders certification by February 14, 1994, including welding procedure." Mr. Tully testified at trial that he understood that GSA was requiring welding that would meet API 1104 standards and demanding welding certifications and welding procedure submittals in accordance with this standard. Mr. Tully stated that this was another example of Mr. Henry trying to force CJP to perform work that was not required by the contract. Mr. Tully explained that he had not intended to weld the gas pipeline to API 1104 standards because the contract did not require compliance with API 1104. Thereafter, when Mr. Tully told Mr. Henry that he did not intend to weld the pipe to x-ray standards, Mr. Tully testified that Mr. Henry told him that the government was not going to pay for welding that did not meet API 1104 standards and that he would make CJP tear out welds that did not meet that quality. By letter dated February 14, 1994, Mr. Tully wrote that "you are requesting that I comply with requirements which are not included in the contract. It is our intention to use certified welders, however [we] will use the test method outlined in the contract for quality assurance of the welds." Mr. Tully testified at trial that he had his welders' certifications in a desk on site but that he did not provide them to Mr. Henry because he understood the dispute to be over the proper welding standard and not his welders' qualifications.[17]

Mr. Tully testified that following the exchange with Mr. Henry, he researched whether the Washington Gas Company re-

---

**16.** API 1104 applies to high pressure pipelines, including gas pipelines operating at pressures that are greater than 125 psig. It is undisputed that the gas pipeline for this project runs at 5 psig. API 1104 requires welders to have special certifications. In addition, API 1104 specifies a workmanship level for each weld and procedures to ensure that individual welds do not have cracks, inadequate penetration, burn through or other defects. API 1104 welds must also present a neat, workmanlike appearance. To ensure compliance with its requirements, API 1104 allows for testing by non-destructive means (*e.g.*, radiographic inspection) or removal of the welds for mechanical tests. Under API 1104 a weld may be rejected even where it meets the acceptance standards, if, "in [the owner's] opinion the depth of a discontinuity may be detrimental to the weld."

**17.** At trial GSA questioned whether Ms. Cudaback was certified. In response, CJP introduced Ms. Cudaback's certification.

quires API 1104 procedures. Mr. Tully contacted the Washington Gas Company and confirmed that it does not have any requirements for welding inside of commercial buildings. This view was confirmed by Mr. Henry, who also verified that the Washington Gas Company did not have any requirements governing gas piping inside buildings. The resolution of the issue was memorialized in a modification that was prepared, but never issued, to pay CJP $2,500 for researching the issue.

Mr. Henry signed a Finding of Fact to support the modification in which he noted that

> ANSI and NFPA 54 have no requirements regarding the installation of gas piping. The local utility originally advised us that they require pipe to be installed in accordance with API Standard 1104.... Mr. Blaine of the local utility, Washington Gas Light Company, later advised us that they have no regulations within buildings and their jurisdiction stop [sic] at the building wall.

> The contractor, CJP, in order to respond to our letter and conversations had to perform the same research outlined above. Since, we did not know what the specifications required and after lengthy research it was determined that ANSI, NFPA and the local utility did not require anything, we feel the contractor is entitled to compensation for the time spent on his research.[18]

---

18. As discussed at length, *infra,* shortly after GSA terminated CJP, Mr. David Walkowiak, a quality control manager for the reprocurement contractor, M & M Welding and Fabricators, Inc. ("M & M") and a visual inspector for welding, noted that the welds did not appear to be sufficiently workman-like to meet API 1104 and suggested that GSA take action to test the welds. On September 14, 1994, Testing Technologies, a testing and inspection services firm, sent a radiographer to x-ray 8 of the approximately 650 CJP welds. Mr. Disselkoen helped select the eight welds with Mr. Walkowiak. Mr. Richard Palmer then interpreted the x-rays. After hearing Mr. Palmer's analysis of the eight x-rays, GSA directed M & M to remove all of CJP's welds and reweld the pipe in accordance with API 1104.

19. The issue of whether API 1104 applies to this contract is still an open question. GSA takes the

Although the parties resolved the dispute in CJP's favor, Mr. Tully refused to sign the modification because it did not allow CJP extra time to complete the contract.[19] In particular, Mr. Tully contended his welding work was delayed by over a month before the parties resolved the issue.[20]

The question of whether the welding standard dispute delayed CJP's schedule remains in contention. It is not disputed that during the time that Mr. Tully was researching the welding standards, GSA issued CJP a hot works permit that allowed CJP to begin welding on February 14, 1994. Mr. Tully explained, however, that this permit only allowed him to begin tack welding on the piping. Mr. Tully explained that tack welding involves placing three to four very small welds, about the size of a pencil eraser, on the piping. Mr. Tully further explained that this procedure was inefficient in Building A because the ceilings were so high that he wanted to do all the welding at once in order to avoid rebuilding the scaffolding for the final welds. As Mr. Tully testified, "it was not productive at all for us to try to get in and tack the piping, then leave and then come back, but I wanted to keep the crew busy. I had them there. I wanted to make production, but I couldn't."

At trial GSA presented the testimony of Mr. Terry Tully, Paul's brother, who stated that tack welding is commonly done on projects of this type and that tack welding is an efficient way to do welding. GSA relied on this testimony to show that the welding stan-

---

position before this court that CJP's failure to meet API 1104 rendered the welding defective and that the termination for default is sustainable on that basis. In addition, GSA argues that CJP's welding also failed to meet the other specifications and warranties in the contract.

20. Mr. Disselkoen testified that CJP was not delayed by the welding dispute because the dispute centered over whether CJP's welders were certified, and CJP could have satisfied GSA simply by producing the certificates. Although welder certification certainly was part of the dispute over the application of API 1104, it was clear from the nature of the correspondence and the proposed modification that the dispute did not turn on CJP simply producing its welder certificates.

dard dispute did not interfere with CJP's ability to complete the project on time.

Mr. Strickler, GSA's expert, also testified that the welding dispute did not delay the project. More specifically, Mr. Strickler referred the court to a March 3, 1994 schedule in which CJP indicated that they would begin the installation of the gas piping on March 7, 1994, and complete the installation by April 6, 1994. According to Mr. Strickler, because the only item on CJP's critical path was obtaining all the heating units for all the buildings, CJP's schedule showed that "there would be no incremental slippage to the mechanical equipment as a result of whatever impact this issue happened to have had." As such, Mr. Strickler did not believe that CJP was entitled to a time extension.

Mr. Gilley, CJP's expert, testified that although CJP was able to do some welding, the welding dispute reduced CJP's productivity. Mr. Gilley acknowledged that from February 14, 1994 to March 7, 1994, CJP was not totally prevented from working because CJP was able to tack weld the pipe. Although Mr. Tully was prepared to do full production welding at this time, Mr. Gilley explained that the tack welding was CJP's attempt to work around the problem. Mr. Gilley argued, however, that because this was not a complex pipe job, tack welding was not required. As a result of CJP's ability to do some work during this time, Mr. Gilley opined in his expert report that "a conservative estimate of the critical-path delay during the impacted period is 50% of the period or 10.5 days." Mr. Powell, CJP's other expert, testified that the delay caused by the welding dispute resulted in a full 21 days of delay. For Mr. Powell, the correct calculation is the day CJP was prepared to do production welding, February 14, 1994, to the day production welding actually began, March 7, 1994.

### F. Additional Disputes During Phase A

After CJP began welding the pipeline, CJP and GSA continued to have sporadic disagreements. The disagreements generally revolved around CJP's alleged failure to provide adequate supervision and to abide by the security requirements of the contract.

Both Mr. Disselkoen and Ms. Walker testified that Mr. Tully's failure to have a proper supervisor on site and his failure to abide by the security procedures in Buildings B and D contributed to CJP's delay in finishing the project.

In particular, both Mr. Disselkoen and Ms. Walker testified that CJP's workers were only efficient when either Paul or his brother Barry Tully were on site. In addition, they both expressed concern over Paul Tully's alleged indifference to security issues at the site. GSA told Mr. Tully at a May 19, 1994 meeting that he was barred from the secure areas because of repeated security violations. At trial, Mr. Disselkoen explained that he reported Mr. Tully to security after Mr. Disselkoen learned that Mr. Tully had entered the secured areas without a badge and escort. Thereafter, on June 2, 1994, Mr. Disselkoen's daily logs show that Mr. Tully tried to enter a secure area to retrieve a wheelbarrow but was refused entry. Mr. Disselkoen believed that Mr. Tully was not sufficiently respectful of security requirements, which Mr. Disselkoen stated he personally took very seriously.

Mr. Tully testified that he had been generally respectful of security requirements and was accustomed to working on jobs with strict security requirements, but that Mr. Disselkoen was undermining his effectiveness. Mr. Tully admitted that he had committed some minor security violations but that there was no reason for him to be barred from the areas in question. He explained, however, that his loss of access did not delay progress on the job. Instead, Mr. Tully testified that these violations cost him more money because he had to hire more supervisors. Mr. Tully also took issue with GSA's contention that he did not provide sufficient supervision on the job. He explained that pursuant to the terms of the contract a supervisor was always present on site.

### G. Final Completion of the Gas Piping

Despite the problems and disagreements discussed above, CJP successfully completed and tested the gas piping in Building A, the largest warehouse, on April 26, 1994, a few

weeks past the April 8, 1994 date the contract identified for completion of Phase A. On April 26, 1994, GSA tested the final section of piping in Building A. Mr. Disselkoen's daily logs reflect that as with all other portions of the gas pipe in Building A, the last section was tested for 2 hours at 100 psig and that, consistent with the contract's testing specifications, it held its pressure for 2 hours.

Even with CJP's progress in completing the gas piping, GSA's on-site staff remained extremely concerned with CJP's ability to meet the August 28, 1994 contract deadline, even though the deadline was over four months away. These concerns were reflected in a draft cure letter dated May 16, 1994, that lists, among other things, CJP's failure to complete the gas piping as a serious deficiency. The draft cure letter also identifies equipment delays as an issue.

In response to Mr. Henry's and Mr. Disselkoen's concerns, both the contracting officer, Joy Walker and her supervisor, Jesse Bowen, attended the next CJP progress meeting on May 19, 1994. Mr. Bowen stated that CJP appeared to be having a difficult time completing the project. He also indicated that GSA might stop the contract due to CJP's lack of performance. During the course of the meeting, however, GSA granted CJP two weeks to demonstrate improved performance. Ms. Walker decided not to issue the draft cure letter. At this point in time, she believed that a diligent contractor still could have completed the contract work on time.

In response to GSA's concerns, CJP completed the gas piping in Building B on May 25, 1994, and the gas was turned on in Building A on May 26, 1994. Under CJP's schedule, CJP was to begin demolishing the old units in Building A on May 31, 1994, so that it could set and install the new units. The specifications required CJP to place the new units in the same location as the existing units. This meant that the old units had to be removed, before CJP could install and connect the new units. CJP's schedule showed that it would complete the electrical and mechanical work concurrent with removing the old units and installing the new units. In keeping with its schedule, CJP advised

GSA, on May 26, 1994, that it planned to begin demolishing the old oil-fired heating units on May 31, 1994.

## H. Suspension of Work

On May 26, 1994, following a regular weekly progress meeting, Mr. Tully provided Mr. Henry and Mr. Disselkoen with an updated bar schedule, which for the first time showed equipment deliveries extending into August and a final contract completion date of September 30, 1994, some 30 days after the date required by the contract. At the progress meeting Mr. Henry, Mr. Disselkoen, and Mr. Tully had discussed CJP's equipment schedules as well as the demolition schedule. During this meeting, GSA's staff did not mention that GSA was considering issuing a stop-work order.

Nonetheless, on the next day, May 27, 1994, Mr. Henry, Mr. Walters, Mr. Bowen, and Ms. Walker held a meeting without CJP present to discuss, as Mr. Disselkoen wrote in his daily logs, "stoping [sic] work on this project before any asbestos work was completed which would disable all units from being used." Following the meeting, Ms. Walker issued a stop-work order. Ms. Walker testified that she issued this order because GSA was concerned that the new units would not be installed by the upcoming heating season on October 15, 1994.

On May 31, 1994, four days after Ms. Walker issued the stop-work order, she conducted another meeting with Mr. Walters, Mr. Jimmy Hopkins, another GSA employee, Mr. Henry, Mr. Disselkoen and Ms. Kathleen McCartney, GSA's in-house counsel. Ms. Walker testified that it was at this time that Mr. Henry provided her with a calculation that showed that 480 man-days of work needed to be done to replace and install the new heating units and that with a 3–4 man crew, the size CJP proposed to use, it would take approximately 120 work days to complete the contract. Ms. Walker explained that Mr. Henry had based his estimate on his belief that it would take 200 hours to complete installation of each unit. According to Ms. Walker, under Mr. Henry's analysis, CJP's 3–4 man crew would take until December to get the new heating system functional.

Mr. Disselkoen testified that he and Mr. Henry came up with the 480 man-day approximation of the time necessary to complete the job by doing a "five-minute scratched out estimate" of how long it would take CJP "to do certain functions of the job that were left to be completed." During his deposition, Mr. Disselkoen referred to the calculation as "his five-minute estimate [in] which basically he scribbled some numbers down real quick. . . ." Mr. Disselkoen testified that the numbers they used were not verified in any way but came from "[m]y own personal experience and Bill Henry's personal experience." Mr. Disselkoen testified that although the estimate had been in writing he did not know what happened to the paper but believed it had been inadvertently thrown away.

Following the May 31, 1994 meeting, Ms. Walker on June 1, 1994, rescinded the May 27, 1994 order with the proviso that "no more than three (3) industrial heaters shall be removed and replace[d] at one time." Ms. Walker testified that she thought this approach would establish CJP's ability to complete the job. However, one day later, on June 2, 1994, Ms. Walker changed her mind and directed that "no work shall be performed on any [of the existing] air handling units." Ms. Walker testified that she does not now remember why she changed her mind. Ms. Walker further testified that when she issued the June 2, 1994 letter, she did not consider the impact it would have on CJP. Instead, she explained, "My concern at the time was that I didn't want to put the Government in a position where we allowed CJP to go in and demo all of the units without . . . all of the units being on site."

In fact, as of June 2, 1994, 18 of the air handling units for Building A were on site and ready for installation. The remaining air handling units arrived on June 8, 1994. Although the boilers and duct furnaces needed to heat the other buildings would not be available for some time, all the units needed to heat Building A and portions of Building B were on site by June 8.

More importantly, it became clear at trial that Ms. Walker's 200–hour time estimate per unit was completely unsupported. The testimony of Paul and Barry Tully, together with all of the experts, including Mr. Strickler, established that GSA's on-site staff had seriously over-estimated the length of time needed to complete the project. At trial, Mr. Strickler, GSA's expert, testified that he estimated that it would take about 55 hours to install each heating unit and that a crew of 4–6 workers could get the job done in about 6 weeks. Mr. Gilley testified that the number was closer to 36 hours, and Paul and Barry Tully each testified that the first units would take about 60 hours to install, but that with experience they could cut the time in half.

It also became clear at trial, that CJP repeatedly tried to correct GSA's overestimate. On June 8, 1994, Mr. Tully received a call from Ms. Walker, Mr. Bowen, Ms. McCartney, and Mr. Hopkins to discuss the stop-work order.[21] In that call Ms. McCartney explained that GSA did not agree with CJP's time estimate and that GSA had determined that CJP could not get the work done without a significant increase in work force. During the call, Mr. Tully tried to explain that Mr. Henry's estimates were not correct. By way of example, Mr. Tully discussed a letter he recently had sent to Mr. Henry, explaining that, contrary to Mr. Henry's approximation, the breeching manufacturer had concurred in Mr. Tully's estimate that it would take only three to four hours for two men to install the flue piping. Mr. Tully's letter to Mr. Henry includes a letter from the manufacturer assuring Mr. Tully that "I would estimate a two man crew working four hours could easily install a Model IPS system." Mr. Tully's explanations apparently left no impression on GSA's staff. In August 1994, prior to the Termination for Default, Mr. Tully once again tried to explain to GSA that his initial 60–hour time estimate was too conservative and that his on-site crew was

---

21. Before trial defendant objected to the introduction of secret recordings made by Mr. Tully of several calls with GSA personnel regarding the subject action. The defendant, however, stipulated to the contents of many conversations, including the above-referenced conversation. Ultimately, defendant waived its objections to the introduction of the CJP tapes and the court has listened to each tape to confirm both the tone and contents of the relevant conversations.

demonstrating that they could get each unit installed in less than half the time. It is clear from Mr. Tully's conversations with GSA's staff and managers that GSA never tried to verify Mr. Tully's estimates and that their decisions consistently were based on the original five-minute scratch estimate, showing that a crew of four would not be sufficient to get the job done before December.

In this same conversation, Mr. Tully learned from Ms. McCartney that GSA believed that because CJP could not possibly meet the August 28, 1994 completion date, GSA was focused on mid-October as the key date for completing installation of the heating units. During that call defendant stipulated that GSA representatives made the following comments to Mr. Tully: "And we need heating by mid-October"; "Mid–October is when it's got to be done. Now, there's certain parts of the work that can be done after that, but nothing related to the heating operation"; "[W]hat we would like you to do, and when you come in tomorrow, is to be able to discuss manhours [and a] real honest to goodness, bottom line performance, with completion by October 18th"; "I don't care what the work is, all I'm saying is, it's got to be completed by mid-October"; "[I]f we see that completion by mid-October is not looking good, we might have to get somebody else to do some of the work. And we want you to look real hard at your schedule, and I mean be able to show in a reasonable fashion that what you can accomplish by mid-October, that needs to be done for the heating." As discussed *infra*, CJP contends that these representations resulted in a modification of the contract completion date from August 28, 1994 to October 15, 1994.

Following the June 8, 1994 phone call, representatives of CJP and GSA met on June 9, 1994 to discuss the stop-work order. At the conclusion of that meeting, GSA instructed CJP to work on everything but the existing heating units. Armed with this revised stop-work order, CJP notified its suppliers that the contract was still on and that deliveries should proceed. In addition, to meet GSA's concerns, CJP increased its staffing during the second half of June and July such that on most days CJP had from six to ten men on site.

Although he had plenty of staffing on the job site each day during this time period, Mr. Tully testified that none of their efforts were advancing final completion of the job because the work that could be done under the revised stop-work order, which included routing power conduit for equipment, was non-critical work. Mr. Tully explained "it's the standard in the industry that the only way you advance progress on a job is ... you have to work on the critical path elements of the work. Doing ... non-critical path work does not advance the completion of the project."

Thereafter, on June 29, 1994, Ms. Walker issued another revised stop-work order that allowed CJP to work on 8 of the 23 heating units in Bays 1, 2, 3, and 4 of Building A. Mr. Tully noted that this was only a small portion of the critical path work. Moreover, because GSA did not give CJP any advance notice, CJP was not able to give its demolition subcontractor advance notice. The demolition subcontractor was not able to start work until July 13, 1994.

Despite Mr. Tully's frustrations with not making progress on the job, GSA's contracting staff apparently was extremely pleased with CJP's progress. In particular, they were satisfied with the amount of manpower CJP was dedicating to the job. As a consequence, the CO offered on July 6, 1994, to provide CJP's bonding company with a good rating on CJP's job performance. During this period, GSA felt that CJP was "manning the project with a lot more people," "showing good intent on the progress on the job," and "providing the personnel to complete the project." Based on GSA's satisfaction with CJP's progress and manpower commitment to the site, GSA rescinded the stop-work order in its entirety on July 19, 1994.

I. The Impact of the Stop-work Orders on CJP's Schedule

The impact of the stop-work orders on CJP's ability to complete the project is at the heart of the disagreement between the parties. Following the issuance of the stop-work orders, CJP made several requests for

equitable adjustments ("REA"), which included requests for time. Ms. Walker and Mr. Bowen, in a tape-recorded meeting on July 6, 1994, stated that the government had made changes to the contract, for which CJP would "have to submit [a] claim."[22] Ms. Walker concluded, "we don't have any questions in our mind that we owe you some money. No question in my mind at all." CJP indicated to the COs that its requests for equitable adjustment covered additional time as well as money for the changes.

In connection with the stop-work orders, CJP submitted a REA on June 27, 1994, for 16 days of delay from May 27, 1994 to June 13, 1994, as a "direct result of the stop work directive of 27 May 94." CJP's total request was for $12,202.86, which included its direct job costs and its extended overhead. By letter dated July 15, 1994, Mr. Walters[23] informed CJP that GSA was denying CJP's claim as to 14 of the requested delay days and requested more information regarding 2 of the delay days. Mr. Walters reasoned that because the CO modified the stop-work order on June 1, 1994, to allow work to be done, CJP was only stopped from working for two days. Mr. Walters pointed out that from June 2 to June 13, CJP could have been installing conduit. With regard to the two days GSA conceded CJP was stopped, Mr. Walters requested more information regarding what the crew was doing on May 31 and June 1, pointing out that if the crew was not at the site for reasons other than the stop-

work order, no compensation should be forthcoming.[24]

Also in connection with the stop-work orders,[25] CJP submitted to Ms. Walker a REA on June 27, 1994, for "time spent coordinating Subcontractors, Suppliers, and all concerned to perform the project as revised by you on 27 May 94, 01 June 94, 02 June 94, and 09 June 94." Mr. Tully included his estimate indicating a total of $2,831.51 due from the government. Mr. Walters responded to the REA by letter dated July 11, 1994. Mr. Walters stated:

> The GSA stop work order of May 27, 1994 was a direct result of your previous failures to meet the contract completion dates required under Phase A of the project. The stop work order was necessary to keep the existing heating units operational as a result of your failures to meet numerous previously submitted schedules. It is the Government's position that any additional coordination costs are the direct result of your previous failures and as a result your request that the Government reimburse you is denied.

This denial was followed closely by GSA's July 11, 1994 denial of CJP's July 7, 1994 REA for "accelerated production for the period of 13 Jun 94 to 15 July 94, which resulted from the Stop Work Order of 27 May 94." GSA responded by stating that the request was denied because the "government did not request that you accelerate production and is not responsible for any claims to this effect."[26]

---

**22.** At the meeting, Mr. Bowen stated, "We have tampered with your contract. We have. And we realize that. And we'll probably have to pay for it. And thats not a big deal. We do it all the time."

**23.** Ms. Walker stated that she had "no way of . . . knowing what is fair and reasonable" in responding to CJP's requests for equitable adjustment. The CO considered herself "strictly an administrative" official, with no technical knowledge of the work involved in the contract. Because Ms. Walker did not have the technical background and knowledge to respond to CJP's equitable adjustment requests, she forwarded these requests to Mr. Walters or Mr. Henry for them to respond.

**24.** In the letter, Mr. Walters also inquired as to why CJP waited until June 13 to return to the job

site and informed CJP that Mr. Tully did not calculate his delay damages correctly.

**25.** CJP submitted various other REAs seeking costs incurred as a result of the stop-work order. GSA denied all of these requests. These REAs included requests for bonus pay fees, legal fees, additional on-site supervision, lost profits, and consulting fees.

**26.** CJP made several other REAs unrelated to the stop-work order. These included, for example, CJP's April 27, 1994 REA for government delay due to a chemical spill; CJP's June 27, 1994 REA for government delay due to painting of mechanical and electrical work in warehouses; and CJP's August 9, 1994 REA for government delay of the asbestos subcontractor due to the failure to provide a government monitor. GSA denied all of these requests.

Although GSA did not grant CJP any time for the stop-work orders, Ms. Walker agreed that CJP would be entitled to a time extension for the stop-work order from May 27 through June 1, 1994. As noted previously, however, Mr. Strickler took the position that, although the stop-work order delayed the demolition and setting of the air handling units, the order had no affect on CJP's ability to complete the contract on time because CJP's equipment delays would have delayed CJP past the contract completion date. According to Mr. Strickler, "[w]e would be looking at still the final deliveries of equipment to the site. It would still be driving the project to completion at this point in time." In Mr. Strickler's view, the late delivery dates meant that the stop-work order did not impact the critical path.

CJP's expert, Mr. Gilley, disagreed with Mr. Strickler's view and calculated 47 days of delay for the period of May 27, 1994, the date of the initial stop-work order, until July 13, 1994, when CJP's demolition contractor resumed work on the critical path. Mr. Gilley explained that as of May 25, 1994, 75 percent of the air handling units that went into Buildings A and B were on site (69% if one includes the boilers). Equally important, although the boilers were not on site, Mr. Gilley opined that removing and replacing the heating units in Building A and B represented 90% of the heating work to be done on the project. Mr. Gilley concluded that when GSA stopped CJP from demolishing the existing units and instead directed CJP to install conduit from June 13 to July 8, 1994, GSA delayed the critical path in favor of non-critical path work that could have been done concurrently with the demolition and installation of the new heating units. Mr. Gilley further testified that although GSA allowed CJP to demolish eight of the units on June 29, CJP was still restrained. Mr. Gilley stated that the piecemeal scheduling impacted crew size determinations and sequence of work decisions, increasing costs and consuming time well beyond what a reasonable contractor would have planned for and bid. Specifically, Mr. Gilley described

the relationship between setting the units and installing the breeching and duct work. Mr. Gilley opined that GSA's contention that CJP could have worked on the breeching before it demolished the units was not supported. Rather, it was essential to have the units set first. Mr. Gilley did not believe that there was enough information on the contract drawings from which you could fabricate the breeching and the duct work without having the units set and actually measuring.[27] For all of these reasons Mr. Gilley testified that CJP was entitled to 47 days of delay due to the stop-work orders.

## J. Progress After the Stop–Work Order Was Rescinded

As noted above, GSA rescinded the stop-work orders on July 19, 1994. The daily logs indicate that CJP had nine men on site on July 19, 1994, and that while the subcontractor was demolishing the old units, CJP's men began installing the new units. Mr. Tully testified that this staffing level and work continued until July 29, 1994 when he sent a letter to Mr. Disselkoen indicating that he was going to be reducing manpower for the first part of August but that he saw no problem in getting the heating completed by October 15, 1994. In the letter, Mr. Tully, states that "Per our discussion yesterday, we will reduce the work force on site next week." Mr. Tully also wrote, "I see no problems in completing start-up of all equipment by mid-October, provided we can continue under the current spirit of cooperation." Mr. Tully explained at trial that he was reducing manpower because CJP needed the men to complete some other jobs, he was waiting for the breeching to arrive, and in any case, he was waiting for information from the government on how to support the gas pipe drops. Mr. Tully testified that he did not believe it would have been productive to have men on the job without knowing how the government wanted CJP to support the pipe drops. The specifications indicated that ceiling drops were not allowed and without further instructions from the architect, CJP was not sure

---

27. Mr. Woods testified that CJP could have ordered the breeching before setting the units based on the contract drawings, and therefore, the stop-work order did not delay CJP's efforts to obtain the breeching.

how to proceed. CJP had, in fact, been improvising by temporarily supporting the gas drops with pieces of wood.[28]

Although Ms. Walker was not aware of the pipe support issue or of Mr. Tully's written notice to Mr. Disselkoen notifying GSA of the temporary manpower reduction,[29] she testified that starting in August she and Mr. Bowen began receiving phone calls from Mr. Disselkoen and Mr. Henry notifying them that CJP only had one to two people on site.

Based on Mr. Disselkoen's representations, Ms. Walker and Mr. Bowen telephoned Mr. Tully on August 10, 1994 to express their concern over his lack of progress based on inadequate manpower. Mr. Disselkoen's daily logs indicate that no CJP personnel ever arrived on site on August 10. Mr. Tully explained to Ms. Walker and Mr. Bowen that three of his men had quit that week but that he had other personnel in the area who would soon be available to work on the GSA job.[30]

Mr. Tully stated that he still saw no problem with getting the heat on by October 15, 1994, but that his estimate depended upon his ability to take measurements of the breeching and flue material in the secure area. He complained that GSA had still not resolved his access problems. Mr. Tully also indicated that he needed the funds he believed GSA owed him from the delays caused by the stop-work orders in order to complete the job. During the call, Mr. Bowen stated, "You may get a letter from Joy sometime in the next day or so to try to get a handle on just how this job is going to be finished up.

So be aware of it." At trial, Ms. Walker testified that she believed this statement provided CJP with sufficient notice that it would soon be receiving a show cause letter.

Later that afternoon, in response to Ms. Walker's request, Mr. Disselkoen prepared a chart of the work that remained to be completed on the project. Mr. Disselkoen's August 10, 1994 chart identified what work had been completed, what work remained, what material was on site, and what material was absent. It did not include any time analysis. Thereafter, on August 11, 12, and 15, Mr. Disselkoen's logs show that only one member of CJP's crew was on site. Mr. Disselkoen testified that he called CJP's office twice and expressed his view that CJP needed to have more crew members at the site. In addition, Mr. Disselkoen's logs show that the demolition contractor was gone from the site by August 11. The logs show that on August 16, 1994, only two CJP workers were present.

On August 16, 1994, Ms. Walker, Mr. Bowen, and Ms. McCartney visited the site to review the project. They walked the job site in order to determine what CJP had accomplished and then held a meeting. At that meeting, Mr. Disselkoen and Mr. Henry "approximated" the amount of work left to be done. Ms. Walker testified that after walking the job site they decided that they should issue Mr. Tully a show cause letter and ask him to explain how he was going to get the job done by the contract completion date of August 28, 1994. Mr. Disselkoen's log for this date indicates that "Cathy [Ms. McCart-

---

**28.** GSA never gave CJP an answer as to how to support the drops. After GSA terminated CJP, however, GSA provided the reprocurement contractor with instructions on how to address this ambiguity in the specifications.

**29.** Mr. Disselkoen never informed Ms. Walker of Mr. Tully's intent to reduce manpower during this time period.

**30.** GSA made much of CJP's labor issues at trial. GSA contends that CJP was not paying its skilled workers their correct salaries and was losing employees for this reason. The deposition of Mr. Charles Bass partially supports this view. Although Mr. Bass stated that his "main reason" for leaving CJP was because he was "tired of traveling, leaving family to go out of state to work," Mr. Bass also stated, I felt like I got more

labor hours than what I deserved. But they paid scale, whatever you were doing. They had a labor scale, and your other different scales. And I just felt like I was getting more labor hours than what I should have got. Mr. Disselkoen believed that CJP's pattern of paying its skilled employees labor-rate wages when they were on site but not performing skilled work violated the labor laws. Mr. Tully explained that because he was not a union shop he was allowed to divide his worker's pay in this fashion. Whether or not CJP was in compliance with the labor laws was not before the court in this proceeding. Nonetheless, the court considered the evidence of the alleged disputes over wages to the extent it had a bearing on CJP's ability to get the work done.

ney] stated that they would give CJP one day to respond and then would issue a termination for default on Thursday." Ms. Walker testified that this note gives the wrong impression because she had not yet decided to terminate CJP for default. As she explained, she intended to allow CJP to respond, and only if he did not respond, would CJP be terminated. Mr. Disselkoen indicated, however, that he understood the decision had been made to terminate CJP no matter what CJP said in response.

### K. The Show Cause Notice

On the afternoon of August 16, 1994, GSA faxed a show cause letter to CJP. The show cause letter stated that CJP was only 57% complete with the project and that the percentage was only 40% if the value of material on site but not installed was not considered. The show cause letter stated further that due to CJP's lack of progress and failure to provide adequate staffing, the CO was directing CJP to show cause why CJP's contract should not be terminated for default. Ms. Walker also warned that if CJP's contract was terminated, CJP would be liable for excess reprocurement costs and liquidated damages. The notice gave Mr. Tully one day, or until August 18, 1994 to show cause why CJP's contract should not be terminated for default.[31] Both Ms. Walker and Mr. Bowen spoke with Mr. Tully on August 18, 1994. During this conversation, Mr. Tully admitted that he had had only two CJP employees on site all week. Both Ms. Walker and Mr. Bowen told Mr. Tully during the conversation that the decision to terminate CJP had already been made. The exchanges between Ms. Walker and Mr. Tully and Mr. Bowen and Mr. Tully were as follows:

Ms. Walker: "Well, we are in the process of defaulting you."

Mr. Tully: "Will you give me until next week to finish something, ma'am?"

Ms. Walker "No."

Mr. Tully: "In other words, you are going to default me anyway? Well, alright, why didn't you tell me when I asked you awhile ago? Why didn't you tell me to start with."

Ms. Walker: "Yes, we are, I just told you we were going to send the default out today."

Mr. Tully: "You gave me until today to respond. So regardless of what our response is, you are going to default me anyway? You just told me that. Thank you very much."

Ms. Walker: "OK, bye bye."

Mr. Tully: "I understand from Ms. Walker that you are going to default me regardless of what my response is to the show-cause notice that you faxed me yesterday."

Mr. Bowen: "That's correct."

Following these exchanges, Mr. Tully wrote to Ms. Walker that same day, stating that he would be on site on August 22, 1994, with his crew to complete the contract by no later than mid-October. He also stated, "I have demonstrated your staff's exaggerated estimating of time required to accomplish various elements of this work, yet you continue to rely on faulty information to pursue terminating this contract."

At trial, Ms. Walker testified that Mr. Tully's response to the show cause letter was inadequate because Mr. Tully did not give her a satisfactory explanation of how he was going to get the work done. She stated that if Mr. Tully had told her the size of the crew he was going to put on the job and the level of effort CJP was going to put into completing the job, she would have let CJP finish the heating project. She pointed to the detailed schedule Mr. Tully had prepared at his counsel's request, after he had been terminated, to show that Mr. Tully could have produced a legitimate response.[32] She explained that

31. Apparently, sometime before GSA decided to issue a show cause notice, Ms. Walker had asked three local heating contractors, including M & M and G & L Mechanical ("G & L") to view the site and consider bidding on a re-procurement contract to finish the project. GSA gave the contractors a handwritten list of work items CJP had completed as of August 17, 1994, but left it up to

the reprocurement contractor to "do a walk-through to determine what they felt needed to be completed."

32. Mr. Tully explained that his detailed schedule shows that shortly after termination, CJP had 1,268 man hours of work left to do on the contract. Based on a three to five man crew, Mr.

Mr. Tully's letter to her, however, was not sufficient and led to her decision to terminate CJP for default.

### L. Termination for Default

On August 19, 1994, GSA terminated CJP's work for default. The termination letter noted GSA's previous directive to CJP to cure its performance and diligently pursue the contract work. The letter also stated that CJP's response to the show-cause notice was inadequate. The letter stated, "Finally on August 16, 1994, you were directed to show cause by August 18, 1994, as to why your contract should not be terminated for default. Your response to my direction was having two laborers on site. However, this does not demonstrate diligent pursuit in performance of the contract as per my direction."

Ms. Walker also documented her decision with a Findings and Determination statement. The CO's findings concluded that CJP had only completed 57% of the contract based upon the percentage of contract price paid; that the 57% was largely based upon material cost rather than labor cost; that based upon CJP's current crew size and performance, the project would not be complete until "well into winter;" and that the contractor's failure to make progress was primarily due to lack of manpower. GSA concluded that CJP had sufficient staffing as of July 31, 1994, but insufficient staffing between August 1–19, 1994. In addition, the findings stated that "[t]he heating units can be in operation by the heating season. An organized, efficient, dedicated contractor could accomplish the work in time to avoid damages from cold weather."

Ms. Walker testified at trial that in making her decision she relied on the information she had received from Mr. Henry and Mr. Disselkoen, together with information from GSA's written records and her own site visits. She stated that she had concerns with the contract all along, beginning with CJP's delays in providing submittals and in not completing Phase A on time. It was because of these concerns that she issued the stop-work orders to "see how CJP could perform." She acknowledged CJP's July surge but stated that beginning on August 1, 1994, she once again started getting information from Mr. Henry or Mr. Disselkoen about CJP's manpower shortage. Ms. Walker also noted CJP's financial problems, labor problems, and equipment delays.[33] Accordingly, when Mr. Tully failed to respond to the show cause order with details about CJP's manpower commitment or a schedule detailing how CJP planned to complete the work, she "lost faith" in CJP. Ms. Walker testified that she believed her concerns were well justified because in order to complete the contract, the reprocurement contractor had three crews of 11 men working around the clock.

Ms. Walker acknowledged that she did not consider whether CJP might be entitled to any time extensions in making her decision. She also explained that she had based the man-hour estimates for the decision to terminate CJP on the same five-minute scratch sheet Mr. Disselkoen and Mr. Henry prepared in May. Ms. Walker admitted that she did not know how many men, what type of equipment, or how long it would take to do all the work that was remaining on the contract at the time she terminated CJP. She further admitted that she had not known how much temporary heat would cost and that she decided that letting CJP provide temporary heat was not an option.[34] Ms. Walker does not remember the analysis she went through to arrive at this conclusion. Ms.

Tully believes that he could have gotten the work done in eight weeks. The schedule indicated that Mr. Tully had expected to complete the project by October 15, 1994.

**33.** Prior to the termination for default Mr. Disselkoen confirmed with CJP's suppliers what he had learned from Mr. Tully's representations—that all of the remaining heating equipment would be on site the first week in September.

**34.** CJP's contract allowed for CJP to supply temporary heat to the warehouses in the project. These provisions contain specific temperature requirements for maintaining temporary heat to office areas occupied by government personnel. Ms. Walker agreed in her deposition that, under these provisions, the contract allowed CJP to provide temporary heat, unless the contract specified elsewhere that temporary heat was prohibited. The parties agreed that no other contract provisions prohibited the use of temporary heat.

Walker did not seem to be aware that the buildings were all heated separately and that it was possible to use a combination of oil and gas heat. Finally, she testified that while she considered August 28, 1994 to be the correct contract completion date, she also had concluded that CJP could not get the heat on by October 15, 1994 either.[35]

### 1. Expert Testimony on the Termination for Default

Mr. Strickler testified on behalf of GSA that CJP's lack of progress by August 19, 1994 establishes CJP's inability to meet the August 28, 1994 contract completion date, and thus the decision to terminate CJP was justified. He further testified that nothing occurred during the history of the contract that would have justified extending the contract completion date. He explained that under his time-impact analyses, which were based on CJP's monthly bar schedules, GSA had not interfered with CJP's ability to meet the August 28, 1994 contract deadline. Mr. Strickler opined that during Phase A of the contract, CJP had provided for extra time or "float" in its schedules and that CJP's disagreements with GSA over gas meter details or the welding standard had not kept CJP from completing Phase A on time.

With respect to Phase B, Mr. Strickler testified that CJP's problems stemmed from CJP's failure to secure timely equipment deliveries. Indeed, Mr. Strickler testified that under the phasing requirements of the contract, GSA could have refused to allow CJP to do any work on Phase B until all the equipment was delivered. Mr. Strickler testified that GSA's stop-work orders also were justified. He stated that CJP's performance history raised serious questions as to whether CJP would be able to get the project completed in time for the heating season.

Mr. Strickler also testified that it would have taken a reasonable contractor approximately six weeks to install all of the heating units, if they had been on site. More specifi-

cally, Mr. Strickler explained that he estimated that it would take approximately 55 hours to set and install each unit. It would then take 3 weeks to make the stack and breeching connections. Mr. Strickler testified that CJP did not have to wait for the units to be in place to order the breeching, but instead could have relied on the drawings and assumed the risk that the breeching would not fit. Mr. Strickler concluded that as of CJP's August 19, 1994 termination, a reasonable, efficient contractor with a crew of 4–6 men could have finished the entire job by September 15, 1994. On cross examination, Mr. Strickler stated that he could not say for certain that CJP could not complete the job by the middle of October, but based on CJP's job history to that date GSA no longer had the luxury of time to allow CJP to try. He concluded that GSA was justified in terminating CJP for default for failure to make progress.

Mr. Gilley testified that the termination for default was not justified because CJP could have timely completed the contract had it not been for government delay. Mr. Gilley testified that CJP should have been given 62.5 days of government delay. In particular, he investigated five time periods and gave time for three.

As noted above, Mr. Gilley determined that CJP's dispute with GSA over the appropriate welding standard resulted in a 50% loss of productivity, which Mr. Gilley translated into 10.5 days of delay. Mr. Gilley gave GSA credit for the time that CJP was tack welding but gave CJP credit for the time lost in having to re-weld.

Mr. Gilley also testified that CJP was entitled to more time due to two change orders issued by GSA, AS–1 and AS–2. These two modifications accounted for the addition of wires for smoke detectors in Building A, extended a 1.5″ gas line to Building 1, and modified gas connections at the gas meter in Building A. As part of the compensation for the additional work required by AS–1, the contract completion date of both Phase A and

---

**35.** Ms. Walker admitted at trial that what was "driving" her and indeed everyone's concerns about the contract was not the August 28, 1994 date but the October 15, 1994 date. She conceded that despite the fact that Mr. Tully was submitting schedules and making representations indicating a September completion date, no one at GSA ever told him that he would have to change his schedules to reflect an August 28, 1994 completion date.

Phase B was extended by two days. AS–2, however, extended the contract completion date of Phase A by 5 days but was silent on an extension of Phase B. Mr. Gilley testified at trial that he believed the parties made a mutual mistake in calculating the extension for AS–2 because any delay in Phase A, the critical path of the project at the time, must have delayed Phase B and therefore required an extension of the contract completion date by 5 days.

Finally, Mr. Gilley opined that CJP was entitled to significant time due to GSA's "ill-conceived" stop-work orders, which he testified resulted in 47 days of delay. Mr. Gilley relied upon a critical path analysis to show that GSA's decision to stop work on the demolition of the existing heating units in Building A on May 27, 1994, resulted in 47 days of delay on CJP's critical path. He testified that he did not see anything in CJP's performance that would have justified a stop-work order at such a critical juncture in the project. As Mr. Gilley explained, all of the heating units for Building A were on site or soon to be delivered. The next step was demolishing the old units and setting the new units. Because GSA stopped that work it delayed the critical path. Mr. Gilley testified that GSA's concern about CJP's manpower commitment was based on a fundamental misunderstanding of the time needed to complete the project. In particular, he explained that GSA's assumption that it would take 200 hours to install each unit was wholly unjustified. Mr. Gilley believed that it would take only 36 man-hours for each unit. He estimated that a four-man crew would have been able to complete the installation within 26 days. Thus, as of August 19, 1994, had GSA not terminated CJP, CJP easily could have finished by October 15, 1994. Indeed, Mr. Gilley testified that 2–6 men crews could have completed the job by mid-September.

Mr. Powell also testified for CJP. Mr. Powell testified that he believed CJP was entitled to a 69 day time extension. He included 21 days for the dispute over the welding certification, 5 days for the contract modification involving the pipe in Building B [36] and 43 days for the delays associated with the stop-work orders.[37] Mr. Powell testified that he could not find any basis to justify the stop-work orders, which he described as "blocking the very heart of the contract." Based on his more than 24 years of service as an engineer administering construction projects in the Navy, with the Army Corps of Engineers, and as the city engineer in Gulfport, Mississippi, Mr. Powell testified that the decision to stop work was poor contract administration.

## M. The Reprocurement Award

Following the termination for default, GSA proceeded to find another contractor to complete the work. Ms. Walker testified that replacing the heating units in all six buildings was her only option. She believed that providing temporary heat would have been too expensive. As noted above, it was unclear whether Ms. Walker appreciated the fact that the buildings were heated separately and that it was possible to replace some but not all of the heating units before the heating season. In addition, Ms. Walker apparently did not know that heating oil was available on site. Given her assumptions, Ms. Walker did not believe that GSA had the time to bid the project competitively. Instead, GSA contacted three local heating companies, M & M Welding and Fabricators, Inc. ("M & M"), Walsh and Rush, and G & L Mechanical ("G & L") and asked them to submit proposals by August 22, 1994. Only M & M and G & L expressed interest in participating in the procurement. GSA gave M & M and G & L the specifications and a site tour on August 17,

---

**36.** Mr. Gilley determined that this did not cause CJP any delay to its critical path, and, as a result, did not assign time to this modification.

**37.** Mr. Powell identified 4 more days of delay because he determined that the delay from the stop-work orders ran until July 19, 1994, when the final stop-work order was rescinded completely. Mr. Gilley determined that although GSA did not rescind the stop-work order until July 19, 1994, GSA's daily logs indicate that CJP's demolition contractor, RRDC, began demolition in a previously restricted area on July 13, 1994. As a result, Mr. Gilley determined the government-caused delay ended on July 13, 1994.

1994, a day after the show-cause order was issued.

GSA received a $691,471 proposal from M & M. The offer from G & L consisted of a one-page letter stating only an overall price of $878,000. Ms. Walker decided that only M & M was within the competitive range. Her sole criteria for determining the reasonableness of M & M's proposal was that it was significantly less than G & L's. She explained that the Federal Acquisition Regulation ("FAR") gives contracting officers broad discretion in conducting procurements following terminations for default and that she had been told by Ms. McCartney, her legal counsel, that her actions were reasonable under the FAR. In particular, Ms. Walker believed that she met the FAR criteria for adequate competition because she had received bid proposals from two responsible bidders.[38] It was for this reason that she believed she did not need an independent cost estimate. Indeed, Ms. Walker testified that she did not question M & M about any aspect of its proposal.[39]

Negotiations on the contract with M & M were finalized on September 1, 1994. Present for the negotiations with Ms. Walker were M & M's representatives, Carey Dove, M & M's president, Sonny Oden, M & M's vice president, and Muggs Mullican. During the negotiations M & M increased its proposal from $691,471 to $701,068. At trial, Ms.

Dove, Mr. Oden, and Mr. Mullican each testified as to how M & M prepared its final proposal. Ms. Dove explained that she had not participated in preparing the initial $691,-471 proposal but had helped to prepare the $701,068 figure. She testified that the final proposal included an estimated labor cost of $226,000, a materials cost of $100,751, and that with 30.5% added in for profit and overhead, the total came to $701,068. Ms. Dove also testified that M & M did not make any money on the project.[40]

Although she is president of M & M, Ms. Dove explained further that her father, Muggs Mullican, and Mr. Oden had been responsible for estimating the labor and materials needed to complete the job. Mr. Oden testified that he estimated he would need approximately $100,000 worth of additional material for the job, but did not remember what the estimate included. He also stated that he had done a preliminary labor cost estimate and had given it to Mr. Mullican. Mr. Mullican testified that he based his $260,000 labor cost estimate on M & M using 3 shifts of 11 men working around the clock. The labor costs represented more than 7,000 hours of work to complete the installation of the heating units.[41]

Ms. Walker testified that GSA finally awarded M & M the contract for $701,000. She testified that M & M's contract was the

**38.** At trial, CJP questioned whether G & L was a responsible bidder. CJP called Mr. Macerollo, G & L's president, who testified about whether G & L was a "responsible" bidder and, in particular, whether G & L would have been able to obtain the required bonding had they been awarded the contract. Mr. Macerollo testified that he did not recall how he came up with his cost proposal, although it was virtually identical to GSA's initial cost estimate of $878,000. Mr. Macerollo testified that G & L had never gotten a contract of that size in the past, or since. He therefore did not know if he could have gotten bonded, which is necessary for a "responsible bidder" determination. Mr. Macerollo stated that he was confident that by putting up his house, however, he could have gotten bonded. He conceded that he has and continues to do work for M & M as a subcontractor and has known Mr. Oden, M & M's vice president, for a considerable period of time.

**39.** Mr. Woods testified that he was not consulted on the reprocurement but stated that before ac-

cepting any bid he would have looked at the work to be done and developed a cost estimate. He stated that the original cost estimate cannot be relied upon because reprocurement contracts are more costly because timing usually is accelerated and efficiency goes down. He would have, however, wanted to see some independent cost estimate.

**40.** During cross examination Ms. Dove, identified a memorandum dated October 4, 1994, that her father, Mr. Mullican, had sent to her sister. The memorandum stated "P.S. I see the end of this Gold Mine! So sad, your Dad!" During his direct testimony Mr. Mullican volunteered that the comment was intended to be sarcastic because "every time you start running good [on this job], then you'd run into trash."

**41.** As noted, GSA's expert Mr. Strickler testified that there were approximately 1,400 hours of work remaining. Mr. Henry and Mr. Disselkoen had estimated that it would take 3,800 hours to install the units.

same as CJP's except for three differences.[42] First, M & M was required to complete all heat-producing work by October 15, 1994, and all other work by December 15, 1994. Second, M & M faced liquidated damages of $1,000 a day for each day it was delayed in completing the heat-producing work. Third, GSA clarified that it wanted all of the gas pipes painted.[43] Ms. Walker explained that although CJP's piping and wiring had not been subjected to final testing, M & M's award was based on the assumption that CJP's piping and wiring were acceptable.

## N. Defective Welding

At trial GSA presented testimony to show that shortly after M & M took over the contract, GSA learned that CJP's welding had been defective and had to be replaced. GSA contends that CJP's failure to provide quality welds is an alternative ground supporting GSA's decision to terminate CJP for default. The decision to replace all of CJP's 650 welds was made in Modification "PS-2" to the M & M contract and cost $423,950. GSA is seeking to recover those costs from CJP.

When M & M was awarded the contract, it sent one of its quality assurance managers, David Walkowiak to look at the welds. Mr. Walkowiak testified at trial, that he went with Mr. Disselkoen to look at welds in Building A on September 15, 1994. Mr. Walkowiak stated that in the course of his visit he looked at 20–25 welds and concluded that the welding required further investigation. In particular, he testified that the welds he viewed did not meet the level of workman-

ship he would have expected for pipeline welds. Based on his evaluation, M & M contacted an independent laboratory to x-ray a sample number of welds to determine whether they complied with the contract specifications. In this connection, Mr. Walkowiak testified that he understood that API 1104 was the standard against which the welds should be evaluated.[44]

Prior to the x-ray testing, Mr. Walkowiak and Mr. Disselkoen toured Building A and selected the welds to be x-rayed. Mr. Walkowiak explained that they wanted to pick different size pipe, from different locations that was welded in different positions (horizontal vs. vertical). Although they had selected approximately 14 welds for x-ray testing, they told the technician to stop testing after only 8 welds. Mr. Walkowiak stated that the decision was based on the level of failure the investigator was finding and "the fact that it was getting late." Following this testing, GSA decided to replace all of CJP's welds.

Mr. Walkowiak, a welding expert himself, testified that after the welds were removed he examined 200 welds. He believed none of the welds met the minimum standards of pipeline safety. He suggested that the welding was so poor that he did not believe that the pipe had held its pressure for two hours during earlier testing. However, when he was told at trial that the pipeline had been energized for several months without incident, he testified that had he known the pipeline had been energized he would have wanted to do more testing. He suggested

---

**42.** At trial, Mr. Disselkoen testified that M & M's contract did not require M & M to remove the old underground heating oil storage tanks or pipelines. He did not know if M & M had ever credited the amount back to GSA. GSA never produced any contract documents to show, who other than M & M and Mr. Mullican's subcontractors worked on the project.

**43.** CJP contended that under its contract with GSA it only had to paint the gas pipe in certain buildings. At a progress meeting, Mr. Bowen apparently had agreed that CJP did not have to paint certain pipes. This modification to M & M's contract clarified GSA's desire to have all of the pipes painted.

**44.** Mr. Walkowiak stated that he and Mr. Disselkoen selected API 1104 as the appropriate standard against which to judge the welds, because it was "less stringent than ANSI B.31.2." Mr. Walkowiak apparently did not know that GSA had concluded earlier that API 1104 did not apply. Mr. Walkowiak also did not seem to know that the gas had been energized in Building A on May 26, 1994, and had been kept on for over three months without incident. For reasons that were not fully explained at trial, the gas was turned off in Building A sometime after CJP had been terminated. Mr. Disselkoen recalled that there may have been a problem with the Washington Gas Company's connection to the building. There was no evidence to suggest that the problem had anything to do with CJP's welding.

that many more welds should have been x-rayed. In addition, he testified that if the pipeline had been "welded and tested in accordance with NFPA 54, [the pipeline] should be safe."

Richard Palmer, the radiograph interpreter who had been hired by M & M to review the 8 test welds, testified as GSA's welding expert at trial. Mr. Palmer explained why he believed CJP's welds were defective and did not meet API 1104.[45] He did not know, however, if the sample he reviewed was statistically valid or even representative.[46] Mr. Palmer explained that many of the welds he inspected after the welds were removed, did not meet the standards established under API 1104 or the general standards established by the American Welding Society. He indicated that of the 30 welds he examined only a third were acceptable.

He stated that he had not known the pipeline had been energized, and if he had known, he would not have removed the welds before visually inspecting each one. He further testified that he was not qualified to opine on whether CJP's welds should have been removed in the first instance. As he explained, because he is not a pipeline engineer he did not do any calculations to determine whether CJP's welds could have withstood the pressure to which they would be subjected over time. Ordinarily, he explained, his findings would have been presented to a pipeline engineer to determine whether the pipeline was safe. He could not say whether the pipeline would fail due to poor welds. He went on to testify that GSA's on-site personnel had not accurately reflected his views in their oral report to supervisors. More specifically, Mr. Palmer stated that although he had told GSA that the welds could fail, a statement which was reflected in the report, he also explained to GSA that the welds might last for 100 years—a statement that was not reflected in the reported meeting notes.[47] He further testified that he had not been told that the pipeline had been energized in May and that the pipeline had met the criteria for NFPA 54. He would not say that a pipeline meeting the criteria of NFPA 54 would not be safe.[48]

Ms. Walker testified that she made the decision to have M & M remove and replace all of CJP's welds based on the information presented to her by Mr. Disselkoen. She explained that she understood from Mr. Disselkoen that it would cost too much to do additional weld testing and that GSA had enough technical data to make the call. Her notes from the phone call indicate that she had understood that "nothing [was] running before [CJP] was terminated." She also testified that she believed that if the welds were not replaced the building could "blow up." [49] She stated that given the wood roof in Building A and the paint, chemicals, and paper stored on site, she had no choice but to replace the welds. Ms. Walker further ex-

---

**45.** CJP concedes that its welds do not meet the standards established in API 1104. Rather, CJP contends that API 1104 did not apply to the contract and that CJP fulfilled its contract obligations when the pipeline passed the tests established in the contract, based on NFPA 54.

**46.** Defendant introduced into evidence seven welds and x-rays of eight welds to prove that CJP's welding did not conform to the contract standards. At trial, the court admitted the welds and x-rays as demonstrative evidence. By motion dated August 6, 1999, defendant seeks to have them admitted as original evidence. Defendant's motion is granted.

**47.** This was another example of GSA's staff failing to provide superiors with the whole truth.

**48.** At trial the court also allowed GSA to introduce, over CJP's objection, CJP's surety's report, which included the opinions of Mr. Gentle, which were based on his briefing by GSA's on-site personnel as to the reasons for removing CJP's welds. Mr. Gentle, the author of the report, was not a welding expert but had been sent by the surety to examine the welds and issue a report. Based on his understanding that CJP's welds had failed to meet API 1104, he concurred in GSA's decision to remove the welds.

**49.** In fact, for the 4-month period between May 26 and October 6, 1994, there is no government documentation showing any leaks or defects in CJP's welding were detected. The first time leaks are discovered is October 7, 1994, when M & M conducted pressure testing on the pipe M & M had rewelded pursuant to Mod PS-2 and found that it could not sustain the 100 psig pressure.

plained that she did not consider how much it would cost to replace the welds.

In response to GSA's decision to replace all of CJP's welds, M & M and GSA negotiated PS–2. The documentation supporting the amendment shows that Mr. Mullican negotiated the terms with Mr. Henry. Mr. Henry apparently had prepared an estimate suggesting a $275,000 price. The price was adjusted to $388,000 to reflect M & M's claim for greater labor costs.[50] At trial, Mr. Mullican testified that he believed that it would have been 25–30% cheaper to have replaced all of the piping as well as the welding, but that GSA wanted to keep CJP's pipe. He nonetheless denied participating in the negotiations for PS–2 or any of the other change orders.

Although Mr. Mullican testified that he did not participate in any negotiations with Mr. Henry on any aspect of M & M's contract, his daughter, Ms. Dove, testified that Mr. Mullican did much of the negotiating on PS–2 and the other change orders at issue in this case. Indeed, Mr. Mullican's participation was memorialized in the meeting notes taken from those exchanges. Mr. Disselkoen also testified that Mr. Mullican and Mr. Henry did the negotiating on all modification claims. Given the written record, Mr. Mullican's adamant denial of his participation in the process, even after he reviewed contemporaneous meeting notes and saw his signature on some of the documents, remains a mystery. (At trial, in response to a question inquiring as to whether or not he negotiated PS–2, Mr. Mullican responded "I'm telling you, not no, but hell no, I did not do it."). As a consequence of Mr. Mullican's testimony, however, the court has no confidence in Mr. Mullican's credibility and has serious questions about the truthfulness of M & M's other representations to the court in this case.

In response to GSA's testimony, CJP presented Mr. Gilley. Mr. Gilley is a mechanical engineer and is familiar with the standards that govern pipeline welding and safety. According to Mr. Gilley, had GSA presented its x-ray findings to an engineer, the engineer would have performed an evaluation to determine whether the pipeline would be safe at the proposed pressure. As Mr. Gilley explained, the GSA gas pipeline is not a high pressure pipeline but a low pressure pipeline, operating at 5 psig. Mr. Gilley then proceeded to demonstrate that with the margin of safety provided for in NFPA, this pipeline would be more than safe. Mr. Gilley noted that the standards are set with an ample margin of safety knowing that all welds will not be perfect. As a mechanical engineer, Mr. Gilley concluded that the pipeline welded by CJP would be safe based on its compliance with NFPA 54.

### O. Other Reprocurement Costs

In addition to seeking reimbursement for M & M's initial contract and PS–2, GSA also sought reimbursement from CJP for the costs associated with modifications involving screw piping, meggered wire, restrapping conduit, smoke detectors, missing fluorescent light fixtures, start-up and maintenance of the 23 heating units and the two boiler conversion units, breeching, and brackets.

Modification AS–12 was for testing gas piping (both welded piping and screw piping) and repairing 30 leaks in the screw piping, for $20,000. GSA never physically observed any leaks and never knew which locations allegedly were leaking. In addition, Mr. Disselkoen testified and his daily logs corroborate that all of CJP's piping passed the pressure tests and the "soap and bubble test" before GSA terminated CJP. In such circumstances, the court had only M & M's word that it was CJP's work that caused the leaks in the screw piping. M & M, however, worked on the screw piping in connection with PS–2, and the 30 leaks M & M reported included ones located on piping installed by M & M.

50. There was considerable testimony at trial regarding the 1.77 multiplier that M & M used to raise its labor rate for PS–2. As Mr. Mullican explained at trial, the multiplier reflected the diminished productivity of M & M's overtime workers. Mr. Strickler also testified that M & M's labor costs were justified. Mr. Strickler testified that M & M was entitled to higher labor costs because he claimed that the "union hall" workers available for overtime work were "the dregs." Paul Gunn, CJP's cost expert, raised questions about the reasonableness and justification for this additional labor charge.

Modification AS–7 required M & M to "megger" [51] electrical wires in Building A for a price of $543. Mr. Henry's "Finding of Fact" for AS–7 shows that he justified paying M & M for meggering work by indicating that the work was required by a "differing site condition." M & M's base reprocurement contract required M & M to perform this work, and CJP's contract had required this megger testing. Neither GSA nor CJP provided M & M with any information indicating CJP had completed the megger-testing.

Modification AS–8 required M & M to repair electrical conduit straps at units H–2–5, H–2–6, and H–2–7 that were installed by CJP and allegedly faulty. Mr. Gilley found that no witness or evidence exists to show the alleged failure occurred. Moreover, M & M had worked on the conduit supported by the straps prior to the alleged failure of the straps. Indeed, the straps allegedly broke while M & M was pulling wire through them.

Reprocurement modification AS–9 called for supplying 22 fluorescent light fixtures for a price of $1,141. M & M's reprocurement contract price of $701,169 already covered the cost of the fixtures and installing them at the height of 16 feet, but this was apparently based on the understanding that the light fixtures already were on site. As acknowledged in the GSA's signed "Finding of Fact," these fixtures were not on site during the survey by GSA of materials left on site, or during the site visit by M & M.

Reprocurement modification AS–16 paid M & M $4,901 for both equipment (Hastings AHU's, boilers, and conversion burners) start-up costs and maintaining operation of the equipment until accepted by GSA. Ms. Walker's decision letter stated that CJP was being assessed the $4,901 to pay M & M for equipment start up that CJP did not include in its purchase of the equipment. The evidence reflected, however, that on September 30, 1993, the same day CJP issued a purchase order to the Hastings dealer/representative for 23 heating units, CJP issued a $29,000 purchase order to Heat Transfer Sales company for freight and start up of those units. Additionally, CJP's December 16, 1993, purchase order to Cleaver Brooks company for three boilers included three days of start up and one day of training. Mr. Tully testified that CJP paid for the start-up costs through these purchase orders. Mr. Gilley stated that it is custom and practice in the construction industry to contract for start-up costs in the initial orders for purchase and Mr. Oden confirmed this in his deposition. CJP's federal auditing expert, Paul Gunn, found that although the government paid $4,901 to M & M for equipment start up, the job cost history report does not show any start-up costs paid by M & M to any party.

Reprocurement modification AS–21 required M & M to reinforce the ductwork on the heating units. The impetus for this modification occurred when the duct work on one of the heating units blew apart. Mr. Oden testified that it was CJP-installed duct work that blew apart. Even if the court determined that it was CJP's duct work that exploded, Mr. Tully testified that it never completed final installation of the duct work.

Reprocurement modification AS–25 required M & M to remove 25 pipe support brackets (i.e., hangers) installed by CJP to hold up the gas piping and replace them with 45 larger, heavier brackets, for a price of $9,000. Reprocurement modification AS–29 required M & M to remove two CJP-installed anchor bolts (i.e., shields) used to fasten each bracket to the wall and replace them with two new expansion (i.e., anchor) bolts or shields of a larger size at 211 locations along the gas line for a price of $17,-497. In connection with AS–25, the specifications allowed CJP to design and fabricate the brackets. Mr. Gilley found that CJP's design calculations, bracket size, and the one anchor bolt it used at the top of the bracket were adequate to support the design load and meet the specifications. In addition, Mr. Tully contended that M & M caused the problems with the brackets when it replaced the welding under PS–2. Mr. Oden contended they were not at fault.

---

**51.** A contractor "meggers" wiring to test if the wire's insulation is good.

## II. DISCUSSION

### A. Burden of Proof

█ It is well-settled that "default-termination is a 'drastic sanction,' which should be imposed (or sustained) only for good grounds and on 'solid evidence.'" *J.D. Hedin Constr. Co. v. United States,* 187 Ct.Cl. 45, 57, 408 F.2d 424, 431 (1969); *See Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 414 (1993).

█ The government is charged with the burden of proving whether a default termination is justified. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 765 (Fed.Cir.1987); *Florida Engineered Constr. Prods. Corp. v. United States,* 41 Fed.Cl. 534, 538 (1998). Once the government has satisfied this burden, the contractor is charged with showing that its failure was excusable. *Florida Engineered Constr. Prods. Corp.,* 41 Fed.Cl. at 538–39.

### B. Termination for Failing to Make Progress

█ Here, GSA defaulted this contract based upon CJP's alleged failure to prosecute the work. Under the applicable FAR provision, 48 C.F.R. § 52.249, a termination for default for failure to prosecute work requires "a reasonable belief on the part of the contracting officer that there was 'no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance.'" *Lisbon Contractors,* 828 F.2d at 765 (quoting *RFI Shield–Rooms,* ASBCA Nos. 17374, 17991, 77–2 BCA ¶ 12,714, 61,735, 1977 WL 2320 (Aug. 11, 1977) (alteration in original)). A termination for default based on a failure to make progress usually occurs where the contractor has fallen so far behind schedule that timely completion is nearly impossible. *See Hannon Elec. Co. v. United States,* 31 Fed.Cl. 135, 143 (1994).

█ In this connection, a decision to terminate for default must be based on a correct understanding of the remaining work and the time left for completion. A decision to terminate for default that is based upon "materially erroneous information as to the labor and time required to complete the work, cannot be said to be a reasonable

exercise of discretion. To hold otherwise would be to reward ignorance and encourage deception." *L & H Constr. Co.,* ASBCA No. 43833, 97–1 BCA ¶ 28,766, 1997 WL 49588 (1997). Accordingly, the CO needs to know not only how much work is left but also the correct contract completion date. Thus, where a contractor is entitled to more time for excusable delays, the CO must extend the contract completion date before comparing it with the amount of work to be completed under the contract. *See Appeal of Technocratica,* ASBCA Nos. 44134, 44273, 94–2 BCA 26,606, 1993 WL 556853 (Dec. 27, 1993).

In the present action, there is no dispute that CJP could not have finished the contract by the August 28, 1994 contract completion date. Rather, the case turns on whether CJP is entitled to more time for any government-caused delay, and if so, whether Ms. Walker's decision was reasonable based on the extended date. In addition, the court also must examine whether, as CJP also contends, the contract completion date was orally extended to October 15, 1994, and if so, whether CJP could have reasonably met that new date.

### C. Plaintiff's Right to More Time

CJP contends that it is entitled to 62.5 calender days of critical government delay. As described above, CJP is claiming 10.5 days for delays caused by the dispute over the appropriate welding standard, 5 days of delay related to contract modifications AS–1 and AS–2, and 47 days of critical delay related to GSA's May 27, 1994 stop-work order and subsequent work restrictions. Whether CJP is entitled to any of these time extensions turns on whether these delays are "excusable" within the meaning of paragraph (b) of the Default clause in FAR § 52.249–10, which was included in this contract under "Construction Contract Clauses."

> Under Paragraph (b): "The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if—(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Ex-

amples of such causes include ... (ii) acts of the Government in either its sovereign or contractual capacity. (2) The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of delay. If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended. The findings of the Contracting Officer shall be final and conclusive on the parties, but subject to appeal under the Disputes clause. (c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government."[52]

■ To recover under the excusable delay clause, the contractor has the burden of proving that the delay was excusable. *See Weaver–Bailey Contractors, Inc. v. United States*, 19 Cl.Ct. 474, 476 (1990). The contractor must show that the delay was beyond its control and that it was not caused by the contractor's fault or negligence. *See id.* In addition, the delay must not have been foreseeable. FAR § 52.249–10; *see Fru–Con Constr. Corp. v. United States*, 44 Fed.Cl. 298, 314 (1999) (citing JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 546 (3d. ed.1995)).

■ Moreover, in order for the court to grant a time extension, the contractor also must show that the excusable event caused a delay to the overall completion of the contract; i.e. the delays must have affected activities on the critical path. *See Wilner v. United States*, 24 F.3d 1397, 1401 (Fed.Cir. 1994), *vacating* 26 Cl.Ct. 260 (1992); *Mega Constr. Co.*, 29 Fed.Cl. at 424–25; *Commer-*

*cial Contractors, Inc. v. United States*, 29 Fed.Cl. 654, 662 (1993).

■ Where there are concurrent delays by the contractor, and the contractor's delay also delayed the overall completion, the contractor must show that it was not the "sole proximate cause" of the delay. *See Avedon Corp. v. United States*, 15 Cl.Ct. 648, 652–53 (1988) (citing *Merritt–Chapman & Scott Corp. v. United States*, 208 Ct.Cl. 639, 650, 528 F.2d 1392, 1397 (1976)). Where delay is concurrent, the contractor can attempt to prove the portion of the delay attributable to the government, that was separate and apart from the contractor's delay. In particular, "[w]here both parties contribute to the delay neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir. 1984) (quoting *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir. 1982); *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944)). "Courts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government." *Id.* It is against these standards that each of CJP's excusable delay claims will be looked at in turn.

## D. Welding Standards Dispute

■ CJP first claims that it is entitled to a 10.5 day delay associated with the dispute over the appropriate welding standard. Mr. Gilley stated that CJP was prepared to begin production pipe installation on February 14, 1994, but was stopped from proceeding when GSA told CJP that CJP had to meet the more stringent standards established under API 1104. As discussed above, GSA eventually determined that CJP did not have to meet API 1104. Thereafter, on March 7, 1994, CJP commenced production welding. Mr. Gilley concluded that the "impacted period" was from February 14, 1994 until March

---

**52.** This provision governs the parties' rights and obligations with respect to delays not covered by other contract provisions. The Changes, Differing Site Conditions, and certain other contract clauses provides for time adjustments as well as money. The delays at issue here do not arise

under any of those provisions. Thus, additional time for these disputes, including the suspension of work dispute must be obtained under the excusable delay provisions. *See* JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 545 (3d. ed.1995).

7, 1994, when CJP was finally allowed to proceed with production welding, or 21 calender days. During this time, however, Mr. Gilley recognized that CJP was able to perform tack welding, which did advance the job. In such circumstances, Mr. Gilley opined that CJP had lost 50% of its productivity and was entitled to 10.5 days.

Mr. Strickler testified that CJP should not get any time because he believed the dispute did not concern the proper welding standard but simply whether CJP's welders were certified. He stated that had CJP submitted the welder certifications instead of researching what the contract required, the issue could have been resolved quickly. He further stated that GSA had not actually stopped CJP from welding because CJP had been issued a "hot work" permit for burning and welding on February 14, 1994. Mr. Strickler concluded that, in any event, CJP never demonstrated that the alleged dispute interfered with CJP's ability to complete Phase A of the contract. He noted that CJP's schedules showed that the gas pipe still would be completed within the time prescribed for Phase A. Mr. Strickler explained that CJP had included extra time or "float" in its schedule to complete Phase A and any delay attributable to the welding issue did not extend the overall completion date of Phase A or the contract.

The court finds, contrary to GSA's contentions, that the welding dispute concerned more than welder certifications. The proposed contract modification relating to the welding standard and the daily logs confirm that the debate centered over the proper welding standards, not individual welder certifications. Nonetheless, the court agrees with GSA that CJP has failed to prove how the delay contributed to an overall delay in completing Phase A or the entire contract. Ordinarily, contractors are free to allocate extra time or "float" and a contractor will be entitled to an excusable delay even though the original contract delivery or completion schedule allows more time than is actually necessary to perform the work. *See Heat Exchangers, Inc.,* ASBCA No. 8705, 1963 BCA ¶ 3881. However, a contractor's freedom to allocate its time and take advantage of "cushions" or "float" may be limited by contract provisions requiring the contractor to begin performance within a certain period of time and prosecute the work diligently. *See, e.g., Malor Constr. Co.,* IBCA 1688–6–83, 84–1 BCA ¶ 17,023, 1984 WL 13137. Here, the phasing requirements of the contract required CJP to complete the gas piping under Phase A before beginning Phase B. As of March 7, 1994, and after resolution of the welding issue, CJP's schedules showed that CJP would finish the piping within the contract time required by Phase A. It is not until May, well after the resolution of the welding dispute, that CJP's schedules show that it is behind in completing Phase A. In such circumstances, CJP has failed to establish how the delay caused by the welding dispute interfered with its ability to complete Phase A of the contract. Given the phasing requirements of this contract, CJP needed to show that the dispute interfered with CJP's completion of Phase A. CJP failed to make the required showing. Accordingly, CJP's claim for 10.5 days of excusable delay is denied.

E. Five Days for Contract Modifications AS–1 and AS–2

▮▮ CJP next argues that it is entitled to more time in connection with contract modifications AS–1 and AS–2. As discussed above, these two modifications accounted for the addition of wires for smoke detectors in Building A, extended a 1.5″ gas line to Building 1, and modified gas connections at the gas meter in Building A. There was no evidence to show that the extensions granted under these modifications were not negotiated fairly and based on the full knowledge of both sides. In such circumstances, the court will not upset the agreement. The claim for five days of excusable delay is therefore denied.

F. The Suspension of Work

The suspension of work clause of the contract provides in paragraph (b) that:

If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in

the administration of this contract ... an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

As noted, time extensions under this clause are governed by the excusable delays clause. The rules governing the reasonableness of a stop-work order are relevant in determining whether CJP is entitled to any time.

■ In order to obtain time or money under this clause, the contractor must show: (1) the delay is of an "unreasonable length of time"; (2) the delay was proximately caused by the Governments actions; and (3) the delay resulted in some injury to the contractor. *See Wunderlich v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 967–68 (1965).

■ The contractor also must show that the government was the "sole proximate cause" of the delay and that no concurrent cause would have equally delayed the contract regardless of the Government's action or inaction. *Merritt–Chapman,* 528 F.2d at 1397. As with excusable delays, the contractor must be able to apportion concurrent delays between contractor delay and government delay. *William F. Klingensmith, Inc.,* 731 F.2d at 809.

CJP seeks 47 days of excusable delay from May 27, 1994, when the stop-work order was issued to July 13, 1994, when CJP resumed work on the critical path to complete the project. For the reasons that follow, the court finds that the stop-work orders issued by GSA were not reasonable and that CJP is entitled to 47 days of excusable delay for this period.

Ms. Walker testified that she issued the stop-work orders based on her concerns that CJP was behind schedule in completing the gas pipeline and that she was worried about CJP's equipment delays. She explained that she was worried that CJP would not be able to complete the contract on time with its limited workforce and that she did not want to find herself in a position in October of not having any heat. She further explained that her decision to stop CJP from demolishing and replacing the old heating units was based on Mr. Henry's and Mr. Disselkoen's five-minute estimate that it would take 480 mandays to complete the project. She understood, based on this estimate, that CJP's proposed four-man crew would take until December to complete the project. She further understood that this estimate assumed that it would take 200 hours to remove and replace each unit. She testified that she never verified these assumptions or questioned her staff. She also testified that she did not consider the impact of her decisions on CJP. She believed that GSA's best interests were served by keeping CJP from performing the core of its contract.

Ms. Walker's decision to stop CJP from removing and replacing the heating units was not only based on erroneous factual assumptions, but it reflected unreasonably poor judgment. To begin with, the decision was based on materially erroneous information as to the labor and time required to complete the work. It became clear at trial that Mr. Henry's and Mr. Disselkoen's work estimates were not correct. Not only did CJP present consistent testimony to show that it should have only taken 30–60 hours to remove and replace a heating unit, but Mr. Strickler, GSA's expert, also testified that removing and replacing each unit would take only 55 hours. He opined that 4–6 men could have completed the job in only 6–8 weeks.

The court finds Mr. Strickler's testimony on this issue to be credible and Mr. Henry's and Mr. Disselkoen's 200 hour estimate wholly unsupported. Mr. Disselkoen admitted that his five-minute estimate was not based on any actual calculations, but was based purely on personal knowledge. Neither he nor Mr. Henry endeavored to verify their estimate with Mr. Woods, who had calculated the initial time estimates, or with the equip-

ment suppliers. Moreover, Ms. Walker never asked them to check their assumptions, even after she was confronted with information from Mr. Tully and his suppliers to show that Mr. Henry and Mr. Disselkoen may not be correct. For example, in the June 8, 1994 phone call, after the stop-work order was issued, Mr. Tully discussed his letter to Mr. Henry regarding the time it would take to install the breeching material. After a May 26, 1994 meeting, Mr. Henry had asked Mr. Tully how long he estimated to install the flue piping at each unit. Mr. Tully stated that it would take "3 or 4 hours for a couple of men." Mr. Henry responded by telling Mr. Tully that he "didn't know what he was talking about." To prove that his estimate was correct, Mr. Tully secured the supplier's estimate that it would take "a two man crew working for four hours" to install the breeching. This apparently made no impression on Mr. Henry or on Ms. Walker.

In addition, even if Ms. Walker's assumptions regarding the time required to remove and replace the units had been correct, her decision to issue a stop-work order was still unreasonable. If Ms. Walker was concerned in late May that CJP would not be able to remove and replace the old heating equipment before the August 28, 1994 contract completion date or the October 15, 1994 heating season because it did not have enough men or all of the equipment, her various stop-work decisions did nothing to address those concerns. In fact, stopping CJP from removing and replacing any of the units made certain that CJP would not get the work done. Rather than issue a cure notice or a show-cause notice demanding that CJP demonstrate how it planned to get the available units installed and functioning within three months, Ms. Walker instead ensured that CJP would not meet the contract completion date.

The court does not take issue with Ms. Walker wanting to allay her concerns about CJP's performance. It was clear from the testimony that CJP was not a perfect contractor and that some of her concerns were justified. Of the various options available to address CJP's performance problems, however, her ultimate decision to have CJP commit men and resources to perform Phase B work that was not on the critical path defies reason.[53] By her actions, Ms. Walker created a situation that guaranteed CJP would fail. Her various stop-work orders can only be said to reflect poor judgment on her part. As Mr. Powell stated, Ms. Walker's decision was "very poor contract administration." The court has given considerable weight to Mr. Powell's testimony regarding proper contract administration, given his years of public service and experience. The court concurs in his conclusion that the stop work decisions were simply unreasonable.

Moreover, GSA's reliance on the phasing requirements in the contract to support the stop-work orders is not persuasive. To begin with, the court does not read the phasing provision as necessarily requiring that each and every piece of heating equipment for each and every building be on site before work could begin on Phase B. This reading is not compelled by the contract and defies common sense. By its plain terms the contract states that "[w]hen the new gas-fired heater and boiler is on site and ready for installation and gas service to the building is fully operational, then the existing oil-fired heater or boiler can be removed." It does not say that all equipment for all buildings must be on site. Instead the contract provides that once replacement units are available they can be replaced. Further, the contract does not create any penalty for failing to have all of the equipment on site by a date certain. The provision does not carry a stipulated penalty or other indicia of a mandatory requirement. Indeed, because each building was heated separately, and areas within buildings could be heated separately, even GSA's project architect, Mr. Woods, testified that it would "not make sense to [him]" to read the contract as requiring all the equipment to be available for every building before work could proceed on Building A.

---

**53.** GSA stipulated that demolishing the old units and getting and installing the new units was next on the critical path.

■ In any event, even if the contract were construed to require all equipment to be on site before the contractor could begin Phase B, there is no question that GSA waived the phasing requirement when it allowed CJP to proceed with demolishing some of the heating units before all of the units were on site. It is well settled that a contractor can use the government's unprotesting observation or acceptance of noncontractual performance to demonstrate that the government has waived a contract requirement. This has been termed a "constructive waiver of specifications." *See* JOHN CIBINIC, JR., CONSTRUCTIVE WAIVER OF SPECIFICATIONS: COAT OF MANY COLORS, 6 NASH & CIBINIC REP. ¶ 43 (1992); *see Hannon Elec.*, 31 Fed.Cl. at 147; *Miller Elevator Co. v. United States*, 30 Fed.Cl. 662, 687–88 (1994). A constructive waiver of specifications occurs not where the contract is ambiguous, but, rather, where the government "has administered an initially unambiguous contract in such a way as to give a reasonably intelligent and alert opposite party the impression that a contract requirement has been suspended or waived." *Gresham & Co. v. United States*, 200 Ct.Cl. 97, 120, 470 F.2d 542, 555 (1972).

■ To prove that a constructive waiver has occurred, a plaintiff must demonstrate four elements: "(1) The CO had notice that the work differed from contract requirement; (2) Action or inaction of the CO indicated that the non-specification performance was acceptable; (3) The contractor relied on the CO's action or inaction; (4) It would be unfair to permit the Government to retract the waiver." CIBINIC, supra, at 107; *see Hannon Elec.*, 31 Fed.Cl. at 147; *Miller Elevator*, 30 Fed.Cl. at 687–88.

■ Plaintiff has met the elements of a constructive waiver. As noted above, assuming the contract required all of the equipment of Phase A to be on site before CJP could begin Phase B, the CO not only had notice that CJP would be deviating from this requirement, but actually gave permission.

On June 29, 1994, GSA gave CJP permission to remove and replace eight units in Building A, despite the fact that all the equipment (i.e., the boilers and duct furnaces) of Phase A had yet to be delivered. Having waived strict compliance with the phasing requirement, GSA cannot now hold CJP to its terms. *See Hannon*, 31 Fed.Cl. at 147; *Miller Elevator*, 30 Fed.Cl. at 687–88. In view of the foregoing, the court finds nothing in the contract itself that compelled issuance of the initial stop-work order or the revised orders.

■ Finally, the court finds that any concurrent delay occasioned by CJP's failure to secure all of the boilers and duct furnaces on time does not bar CJP from establishing an excusable delay. GSA contends, based on Mr. Strickler's testimony, that regardless of the reasonableness of the stop-work orders, CJP cannot escape the fact that its schedules showed equipment deliveries beyond the August completion date, and therefore CJP would not have met the contract completion date in any case. For this reason alone, Mr. Strickler opined that CJP's failure to meet the contract completion date was due to its own acts not GSA's.

Although there is no doubt that CJP might have run into critical path delays had it been able to install the heating units and then found that it could do no more work because the boilers and duct furnaces were delayed, this never happened.[54] At the time CJP was stopped on its critical path, all of the heating units for Building A were either on site or soon to be delivered. There was no dispute that demolishing the old units in Building A and installing the new ones was next on the critical path. GSA had recognized this much in its response to CJP's interrogatories. The old units had to be demolished in order to place the new units in their same location. Converting the heat in Building A amounted to approximately 90% of the work under the contract. All of the expert evidence indicated that if CJP had been allowed to install the new units in Building A, it would have sub-

---

**54.** In addition, the court is not convinced that CJP could not have expedited the delivery of this equipment. Mr. Gilley testified that it is common for manufacturers to expedite production schedules. Before he was terminated, Mr. Tully was involved in correspondence with Tate engineering in an attempt to get the delivery of the boilers expedited. In fact, the boilers and duct furnaces were all on site and ready for installation on September 7, 1994.

stantially completed the contract by August 28, 1994.[55] This provides a basis for the court to apportion the delay. The court finds Mr. Strickler's testimony to the effect that the stop-work orders did not delay completion of the contract unpersuasive. He assumed that CJP was bound by the phasing requirement and therefore opined that, until all of the equipment was on site, CJP could not begin Phase B. Mr. Strickler did not address the impact the stop-work orders had on CJP's ability to complete the 90% of the project that was possible to complete with the equipment that was available on site. Mr. Strickler also did not address the fact that the buildings were heated separately. Mr. Gilley's critical path analysis gave a far more credible picture of how the stop-work orders kept CJP from meeting its contract obligations.

■ In view of the foregoing, GSA's reliance on *Green Int'l, Inc.*, ENGBCA No. 5706, 98–1 BCA 29,684, 1998 WL 156667 (1998) (stop-work order not abuse of discretion given contractor's "failures" to comply with contract requirements, and "bellicose" attitude of contractor regarding compliance with technical staff's requirements) and *PNC Corp.*, ASBCA No. 41561, 95–2 BCA 27,807, 1995 WL 415555 (1995) (government order stopping demolition work justified when contract required arrival of windows prior to demolition) to support the stop-work order is misplaced. As stated above, the government may stop a contractor from working under the suspension of work clause, but the contractor will be entitled to an equitable adjustment for any *unreasonable* delays. In this connection, numerous courts have noted that the suspension of work clause does not define what constitutes a reasonable or unreasonable period of delay. *See De Matteo Contr. Co. v. United States*, 220 Ct.Cl. 579, 589, 600 F.2d 1384, 1390 (1979); *Commercial Contractors, Inc.*, 29 Fed.Cl. at 662; *CCM Corp. v. United States*, 20 Cl.Ct. 649, 658 (1990). The result necessarily is a fact-based inquiry into each case. "Whether a particular delay

is reasonable or not depends upon the circumstances of the particular case." *Commercial Contractors, Inc.*, 29 Fed.Cl. at 662; *CCM Corp.*, 20 Cl.Ct. at 658. As these cases indicate, the court has reviewed carefully the circumstances of this case, including CJP's deficiencies and GSA's actions in response, and for all of the above-noted reasons, has determined that the stop-work order was unreasonable. Therefore, the court finds that CJP was entitled to 47 days of excusable delay.

### G. CJP's Contract Was Not Orally Extended

CJP also argues that the June 8, 1994 telephone conversation between Mr. Tully, Ms. McCartney, and Ms. Walker to discuss the stop-work orders established a new contract completion date of October 15, 1994. CJP contends that Ms. McCartney's commitment not to take action if CJP could show that it could get the work done by that date amounted to a contract modification. GSA argues in response that by its terms the contract completion date could be extended only in writing and that GSA never confirmed this understanding in writing, and thus, the contract date was not extended.

■ The court agrees with GSA. First, it is undisputed that GSA never issued a change order extending the project completion date as required by the contract.[56] Second, although GSA's commitment to CJP comes very close to creating a binding promise, a careful review of the conversation reveals that CJP was never given a contract extension or a commitment never to enforce the August 28, 1994 date. In the conversation, Ms. McCartney states that GSA will not terminate CJP if they can get the job done by October 15, 1994, but she does not say that she will formally extend the completion date nor does she suggest that liquidated damages will be waived or that August 28, 1994 would not continue to have any legal effect. In such circumstances, the court finds that the contract was not extended to

---

55. At trial, Mr. Strickler could not say that CJP could not have completed installing the new units in 6–8 weeks.

56. Section 00800–2.03 of the contract concerning "Time Extensions" explicitly contemplates that any time extensions would be granted via a written "change order."

October 15, 1994 and that GSA was not legally estopped from terminating CJP before that date. In order to establish estoppel against the government, CJP would have to demonstrate the following:

> (1) [T]he party to be estopped must know the facts . . .; (2) the government must intend that the conduct alleged to have induced continued performance will be acted on, or the contractor must have a right to believe the conduct in question was intended to induce continued performance; (3) the contractor must not be aware of the true facts . . .; and (4) the contractor must rely on the government's conduct to its detriment.

*Advanced Materials, Inc. v. Perry,* 108 F.3d 307, 311–12 (Fed.Cir.1997) (citing *American Electronic Labs., Inc. v. United States,* 774 F.2d 1110, 1113 (Fed.Cir.1985)). Although it is a close call, the court does not find that GSA intended CJP to rely on a October 15, 1994 contract completion date.

### H. The Termination for Default Was Not Justified

■ In view of the 47 days of excusable delay owed to CJP, the court must evaluate GSA's decision to terminate CJP against an October 7, 1994 completion date.[57] At trial, Ms. Walker stated that she believed that CJP was not only terminated for failing to meet the August 28, 1994 date but because CJP could not have finished by October 15, 1994 as well. Ms. Walker testified that CJP's failure to man the site adequately and meet its commitments led her to "lose faith" in CJP's ability to get the job done. The court does not doubt the sincerity of Ms. Walker's beliefs. However, a review of the facts reveals the absence of data to support her beliefs. Ms. Walker terminated CJP without ever examining a time-schedule or manpower assessment. She terminated CJP without any clear understanding of what needed to be done and how long it would reasonably take. Her decision was based on incomplete information at best and mistaken

information at worst. As such, it cannot be sustained.

The court has reviewed the chart Mr. Disselkoen prepared of those items that were completed and those that were left to do, but that chart contains no time or manpower analysis. Mr. Disselkoen never provided Ms. Walker with any analysis of what the chart meant. Indeed, at the time of the termination for default Ms. Walker still understood that it would take 200 hours to place each unit and that a four-man crew could not have gotten the job done until late December. However, GSA's own expert made it clear at trial that a 4–6 man crew could have gotten the job done within 6 weeks, and he could not say that CJP would not have successfully completed the contract had it been allowed.

Ms. Walker's reliance on this mistaken estimate by her staff permeated her decision. As noted at the outset, a termination decision based on erroneous information cannot be sustained. *L & H Constr. Co.,* ASBCA No. 43833, 97–1 BCA ¶ 28,766, 1997 WL 49588 (1997). Ms. Walker's decision fails this threshold test.

Further, Ms. Walker compounded her error by never questioning any of the assumptions she relied on in her termination decision. She concluded that CJP had sufficient manpower staffing as of July 31, 1994, but insufficient staffing between August 1 and August 19, 1994. CJP's change in manpower level between August 1 and August 19 was the primary reason Ms. Walker cited for CJP's termination for default. At trial Ms. Walker revealed that she had not been told that CJP had written to GSA to say that it would be reducing its manpower for a brief period; she apparently believed that CJP had simply walked away from the job. She also did not realize that the demolition contractor was working throughout much of this period. Further, while there were days that CJP did not have a crew on site, the daily logs reveal that throughout the project CJP maintained an average crew of four on site.

---

57. *Because CJP was entitled to 47 additional days, or nearly 7 weeks, GSA's reliance on the percentage of work remaining as an indication of concern is misplaced. The expert evidence dem-* onstrated that 6–8 weeks would have been enough time to complete installation of the new heating system.

Yet, Ms. Walker's staff led her to believe that CJP had averaged only 2–3 men during the entire contract. Moreover, Ms. Walker had no way of knowing if CJP had an adequate crew on site because Ms. Walker never compared CJP's manpower levels against the critical-path work that was available to be done at the time. In fact, the parties stipulated that "between August 1 and August 19, 1994, there was no critical-path work that could be done by CJP employees."

Ms. Walker's concerns about CJP's financial vulnerability and labor problems, which were also identified in her findings and determination, were equally unsubstantiated. There is no doubt that CJP had complained about money problems after the stop-work orders were issued. There was, however, no evidence to suggest that CJP was not financially capable of finishing the job. Ms. Walker certainly did not take any steps to confirm her assumptions. With respect to this issue, CJP established at trial that it had the resources needed to finish the job. A July 8, 1997 letter from Wachovia Bank showing the lines of credit used during this project demonstrates that CJP had enough resources to finish the project. Similarly, Ms. Walker never took any steps to confirm whether CJP was having real labor problems or some isolated employee disputes. The evidence established that the labor issues were isolated. There was no evidence to show that CJP was not able to obtain workers.[58]

Finally, contrary to established precedent, Ms. Walker never examined the impact of her decisions on CJP. She never considered whether CJP would be entitled to more time due to the stop-work orders or what impact her order had on getting the job completed. She simply assumed that her stop-work orders were reasonable and that CJP was not entitled to any more time. *See Appeal of Technocratica*, ASBCA Nos. 44134, 44273, 94–2 BCA 26,606, 1993 WL 556853 (Dec. 27,

1993). The court finds that CJP would have been able to substantially complete the contract had GSA granted CJP the 47 days CJP was entitled to receive. Accordingly, the court finds that GSA has failed to sustain its burden on its decision to terminate CJP for default based on a failure to make progress.

### I. Defective Work

■ GSA also argues that the termination for default is justified based on CJP's allegedly defective welding of the gas pipeline. A default termination may be sustained based on any valid grounds existing at the time of termination, "regardless of whether the Government originally removed the contractor for another reason." *See Kelso v. Kirk Bros. Mechanical Contractors, Inc.* 16 F.3d 1173, 1175 (Fed.Cir.1994). Thus, "any extant reasons supporting a default termination are sufficient to sustain the default, even if not known or discovered until after the decision to terminate for default is made." *See Mega Constr. Co.*, 29 Fed.Cl. at 421. Whether a termination for default may be sustained on this basis turns on two questions. First, the court must determine the proper welding standard and second, whether CJP's welding met that standard.

GSA and CJP disagree as to the welding standards applicable under the contract. CJP contends that it was only required to meet the welding standard for the gas piping set forth in Specification 3.02, which requires compliance with NFPA 54. GSA argues that the welding was to have met the x-ray quality mandated by API 1104. It is not disputed that CJP's welds did not meet the technical requirements for compliance with API 1104, or that its welds were of x-ray quality. Despite GSA's earlier decision not to require compliance with API 1104 or to require anything more under ANSI B31.2, it now contends that the contract required compliance

---

**58.** Moreover, GSA's concerns about CJP's finances and its labor and security problems did not rise to the level to support a termination for default. The court finds that CJP was not free from fault, and that GSA had, at times, legitimate concerns about its performance. CJP's problems, however, were not atypical of those experienced by other contractors. It is well-settled that the drastic action of termination for default

should not be used to remedy "deficiencies of the kind every construction contractor routinely experiences on the job." *See J.D. Hedin Const. v. United States*, 187 Ct.Cl. 45, 57, 408 F.2d 424, 431 (1969). Accordingly, despite CJP's contributions to its own problems on this contract, the court does not find that any of the problems identified by GSA established grounds for a termination for default.

with these standards. Thus, the court must examine whether CJP had to prepare x-ray quality welds under the contract. In addition, even if CJP was not required to meet x-ray quality, GSA also contends that CJP's welds fail to meet the warranty provision of the contract, which requires that work performed "conforms to the contract requirements" and is free of any "defect in ... workmanship performed by the contractor."

### 1. The Contract Did Not Require CJP to Comply with API 1104

Contract interpretation begins with the plain language of the agreement. The United States Court of Appeals for the Federal Circuit requires that the language of a particular contractual provision should be read "in the context of the entire agreement." *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed.Cir.1996), *cert. denied*, 525 U.S. 818, 119 S.Ct. 57, 142 L.Ed.2d 44 (1998). In this connection, "[t]he crucial question is what the [contractor] would have understood as a reasonable construction contractor, not what the drafter of the contract terms subjectively intended." *Corbetta Constr. Co. v. United States*, 198 Ct.Cl. 712, 461 F.2d 1330, 1336 (1972).

There are three sections of the contract that reference codes, standards, or requirements related to the gas piping. First, section 3.02 governed "Installation of Natural Gas Piping." This specification directed CJP to "Install natural gas piping as shown on the drawings in accordance with *NFPA 54.*" The specification continued by requiring that "[t]he connection to the piping and valves outside the building and meter installation shall be in accordance with Washington Gas Company requirements." Second, specification 3.06 governed "Testing." This section provided:

(1) General: Inspect, test, and purge natural gas systems in the presence of the Contracting Officer in accordance with *NFPA 54* and *Washington Gas Company requirements* and as follows:

(A) Visually examine natural gas system after installation.

(B) Pressure test natural gas system with dry air or nitrogen at 100 psig

for two hours. Soap test all joints to detect leaks.

(C) Flush and purge natural gas system and charge with gas in accordance with Washington Gas Company requirements and NFPA 54.

Finally, section 1.02 of the contract addressed "Quality Assurance." This section provided:

(2) Codes and Standards: Provide natural gas system conforming to the following:

(A) *ANSI:* Fabricate and install natural gas piping in accordance with ANSI (American National Standards Institute) B31.2, "Fuel Gas Piping".

(B) NFPA: Fabricate and install natural gas piping in accordance with NFPA (National Fire Protection Association) 54, "National Fuel Gas Code."

(C) Local Utility: Fabricate and install natural gas systems in accordance with Washington Gas Company regulations.

GSA argues based on these contract provisions that the contract established four different standards applicable to the welding: NFPA 54, ANSI B31.2, Washington Gas Company Regulations, and, by incorporation, API 1104. Neither party disputes the applicability of NFPA 54. GSA and CJP disagree over whether the more stringent requirements of ANSI B31.2, and Washington Gas Company welding requirements, including API 1104 also applied to the welds under this contract.

In support of its interpretation, GSA references the "Overlapping and Conflicting Assignments" clause of the contract, which mandated that CJP comply with the "most stringent requirements" where compliance with two or more industry standards is specified. Based on this clause, GSA argues, despite its prior decision on welding standards, that Washington Gas Company regulations, which incorporate API 1104, should be the controlling standard because it provided the strictest standard under the contract.

GSA also argues that ANSI B31.2 applied to the welds through section 1.02, which mandated that CJP "Fabricate and install natural

gas piping in accordance with ANSI (American National Standards Institute) B31.2, 'Fuel Gas Piping,'" even though it has been withdrawn.

CJP argues in response that the only standard that applied to the gas piping was NFPA 54 and that no specific "welding requirements" were included. CJP contends that GSA's reading creates a conflict by suggesting that the Quality Assurance provisions establish a welding standard that was not referenced in the testing and installation sections of the contract. Moreover, CJP argues that GSA's interpretation would have required testing of CJP's welds under standards that are not specifically mentioned under the "Testing" procedures of the contract. CJP argues instead that Washington Gas Company requirements for welding of piping on the outside of buildings do not apply and that ANSI B31.2 applies to the contract through NFPA 54, which has incorporated ANSI B31.2 by reference.

In the courts view, this contract did not require CJP to comply with any specific welding standards. By its terms the contract provided in the "installation of natural gas piping" section that the contractor shall "install natural gas piping as shown on the drawings in accordance with NFPA 54." Although paragraph 3.02.A.3 references "Washington Gas Company requirements" the Washington Gas company has made it plain that they only apply API 1104 to welding connections made "outside the building." The court has no basis to question the Washington Gas Company's interpretation of its own regulations. Indeed, GSA previously confirmed that interpretation when the issue first arose. As discussed above, in July 1994, Mr. Henry signed a "Finding of Fact" for a contract modification that was written up (but never signed) to pay CJP $2,500 for its research work pertaining to this issue.

■ The fact that the Quality Assurance section references "fabrication and installation" of natural gas piping in accordance with ANSI B31.2, does not mean that CJP should now be held to a more stringent welding standard that has been withdrawn since 1988.

Under CJP's contract, the "Installation" specification stated that only NFPA 54 was to apply to installation of the gas piping. Where two or more clauses of a contract conflict, the clause that is specifically directed to a particular matter controls over a clause that is general in its terms. *See Nielsen–Dillingham Builders, J.V. v. United States,* 43 Fed.Cl. 5, 9 (1999); *United Pac. Ins. Co. v. United States,* 204 Ct.Cl. 686, 694, 497 F.2d 1402, 1406 (1974). Moreover, the amendments to NFPA 54 make plain that the relevant portions of ANSI B31.2 have now been incorporated into NFPA 54.[59] Accordingly, compliance with NFPA 54 constitutes compliance with ANSI B31.2.

■ To the extent any doubt remains as to whether this contract established express "welding" standards for CJP, that doubt is resolved by looking at the specific "welding" standards in the contract, which makes clear that when the drafters of the contract wanted more specific and more stringent welding requirements to apply, they stated so explicitly. For example, Section 15510 of the contract dealing with "Hydronic Piping Systems" specifically lists the qualifications the welders who would be doing this work were required to have and also lists specific welding procedures that had to be followed. Thus, the court finds that API 1104 is not the applicable welding standard under the contract.

2. Welding Workmanship

■ Because the contract did not expressly require compliance with API 1104 or installation in accordance with any portions of ANSI that have not been incorporated into NFPA 54, the court must now decide whether CJP's workmanship was so deficient as to breach the warranty provisions of the contract. The court finds that the welding was sufficient to meet the contract terms. Several facts guide the court's decision.

First, the daily logs detail all the pressure testing that occurred on the gas pipelines. All the piping in Buildings A, B, and D passed a 100 lb. pressure test with no drop in pressure for two hours. Second, it is not

59. *See, supra,* note 15.

disputed that the gas line in Building A actually was energized. On May 26, 1994, Mr. Disselkoen reported that the gas company had performed a "check for leaks in main gas line and found no leaks" and that he "[o]bserved pressure test with nitrogen and there were no leaks." Indeed, the gas line was energized for several months without incident. Third, despite GSA's best efforts to elicit testimony that these welds could lead to a "catastrophic failure," none of the GSA's experts unequivocally supported this position.

Mr. Palmer testified that he had stated that while he believed "the welds on this gas line could fail at any time," he also informed GSA's staff at the same time that "the welds could last 100 years." Mr. Palmer conceded that he was not a pipeline engineer and could not give a meaningful opinion as to the pipeline's overall safety. He also stated that if a contractor's pipeline complied with NFPA 54, he could not say that it would not be safe. Mr. Walkowiak, M & M's former quality assurance manager, also conceded that assuming the piping was welded and tested under NFPA 54, he could not say that the pipeline would not be safe.

Finally, the court heard the uncontroverted testimony of Mr. Gilley, a mechanical engineer, regarding the stress that CJP's welds would have to endure. Mr. Gilley conceded that some of CJP's welds contained defects but testified that defective welding is a factor built into the system design. Mr. Gilley pointed out that NFPA 54 only required a 7.5 lbs pressure test but that CJP's welds withstood a 100 lb. test for over two hours. As Mr. Gilley explained, "that's 20 times greater than the operating pressure. And I believe that [the 100 lbs] test would have routed out any defects so serious in the pipe welding that would have caused an immediate failure or would have routed out defects that would have affected a long operational life." Mr. Gilley then proceeded to do the calculations to show that because the welds were known not to leak, the only concern would be the effect of pressure over time and that at the 5 psig pressure the GSA pipeline would experience, there would be no reason to believe the pipeline would fail.

Based on the extensive testimony the court heard regarding CJP's welds, the court does not doubt that CJP's welds were not perfect and that some may have had serious problems when judged against certain welding standards. Nonetheless, it is not disputed that the welds passed the testing requirements of the contract and that the pipeline was energized for several months without incident. These facts, together with Mr. Gilley's unrebutted testimony regarding safety lead the court to conclude GSA failed to establish that CJP breached the warranty clause of its contract.

For all of these reasons, the court finds that GSA's termination for default cannot be sustained on this basis.

## J. The Reprocurement

Having concluded that GSA did not meet its burden of establishing grounds for its termination for default decision, it is not necessary for the court to reach the reasonableness of the reprocurement. In the interest of justice, however, the court will examine the issue in the alternative and rule accordingly.

The Default clause at FAR § 52.249–10, which was incorporated into this contract, provides the rights of the government after terminating a contractor for default. The clause states:

> In [the event of a termination for default], the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes *any increased costs incurred by the Government in completing the work.*

48 C.F.R. § 52.249–10 (1984).

 Although the government may charge the defaulted contractor with the excess costs of reprocurement under this

clause, the government must prove the reasonableness of the costs. *See Cascade Pac. Int'l v. United States,* 773 F.2d 287 (Fed.Cir. 1985). In *Cascade,* the Federal Circuit set out the test for determining whether excess procurement costs are reasonable. The court stated that

> Excess reprocurement costs may be imposed only when the Government meets its burden of persuasion that the following conditions (factual determinations) are met: (1) the reprocured supplies are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default. The first condition is demonstrated by comparing the item reprocured with the item specified in the original contract. The second condition requires the Government to show what it spent in reprocurement. The third condition requires that the Government act within a reasonable time of the default, use the most efficient method of reprocurement, obtain a reasonable price, and mitigate its losses.

*Id.* at 293–94 (citations omitted).

The court heard extensive testimony from GSA and the reprocurement contractor regarding both the reprocurement contract and its modifications. For the reasons that follow the court finds that the reprocurement price was not reasonable and CJP should not be required to reimburse GSA. The government's failure to sustain its burden under *Cascade,* coupled with the court's serious doubts about the truthfulness of the reprocurement contractor, M & M, provide the basis for the court's decision.

### 1. The Base Contract

Ms. Walker testified that there was no time to seek competitive bids for the reprocurement because time was of the essence. She believed she had no option but to replace all of the heating units in all of the buildings by October 15, 1994. She solicited bids from three contractors, but received bids from only two of them, M & M and G & L. To evaluate whether the two proposals were fair and reasonable, Ms. Walker and Mr. Bowen looked at the two proposals, saw that M & M's price was lower, and "stated [that both proposals] were fair and reasonable." She then proceeded with formally awarding the contract. At trial the court heard testimony from representatives from M & M Contracting and G & L regarding the "fairness and reasonableness" of their bids. Because Ms. Walker had based her "fairness and reasonableness" decision on a comparison of the two bids the court was particularly interested in the basis for their proposals.

Mr. Macerollo, president of G & L contracting, could remember little about the preparation of his bid. CJP's counsel asked Mr. Macerollo to explain whether G & L had looked at the original government estimate. G & L's bid of $878,000 was almost a perfect match of the original government estimate of the project of $878,300. Mr. Macerollo stated that he could not recall. Mr. Macerollo also was uncertain as to whether he could have secured the bonding necessary to undertake the work had he gotten the contract. Mr. Macerollo thought that he probably could have put up his private home to secure the bonding.

The court also heard testimony on M & M's bid preparation from Ms. Dove, Mr. Oden, and Mr. Mullican. These three offered conflicting testimony and the court has serious questions as to the credibility of each, and in particular, Mr. Mullican. Ms. Dove testified that she had no part in preparing the original $691,471 proposal. She testified that Mssrs. Oden and Mullican did the estimate in their head. Mr. Oden testified that he estimated that M & M would need $100,000 worth of more equipment to finish the job and that he gave Mr. Mullican a $226,186 estimate for labor costs. Mr. Oden stated that Mr. Mullican, prepared the final proposal. Mr. Mullican explained that he accepted Mr. Oden's equipment budget and that he based his final labor costs on the assumption that he would need 3 round the clock shifts of 11 men to replace all of the heating units within the 6 weeks provided for under the contract. M & M's labor cost proposal translated into payments for over 7,000 hours of work.

M & M's proposal was nearly twice the estimate prepared by Mr. Disselkoen, which assumed that the work would take 480 man-days (or 3,800 hours). And it was over three times Mr. Strickler's expert testimony to the effect that completing the heating system would take 250 man-days (or 2,000 hours). Mr. Strickler stated that applying the appropriate labor rate, this would amount to approximately $50,000 or $75,000, with the cost of benefits included.[60] Despite the wide disparity between his estimate and M & M's, Mr. Strickler explained at trial that he was not shocked by M & M's high labor costs. He noted that M & M had very limited time to complete the work and therefore would need more labor. Earlier, however, Mr. Strickler had testified that "a dedicated contractor with a crew of 4–6 men could have finished the job in 6 weeks," i.e. within the time provided to M & M. Mr. Strickler further noted that a new contractor would need more funds to mobilize on the site. Here, however, all of the equipment was on site already and there was an office immediately available for supervisors. Mr. Strickler then explained that the real problem was that M & M's workers would not likely be very productive because the workers would have to learn the job, and M & M was a union shop. Mr. Strickler stated that "when you are going to the union hall for your people you get what is called the dregs." In response to a question on cross-examination as to whether it would be fair to charge CJP for the work of "dregs", Mr. Strickler reasoned that "if the T for D was a proper action then I think those costs would be reasonable." As a result, Mr. Strickler testified that he would expect the labor costs to double. M & M's labor costs were nearly two times Mr. Strickler's highest estimate.

■ The court finds M & M's reprocurement proposal and GSA's acceptance of the proposal unreasonable. Ms. Walker's failure to conduct a competition, negotiate a price, or prepare any price analysis is not supportable. In assessing whether reprocurement costs are reasonable the court may consider

whether there was a lack of negotiation or price analysis or a lack of adequate competition. *See Wise Instrumentation & Control, Inc.,* NASABCA 1072–12, 75–2 BCA ¶ 11,478, 1975 WL 1969. Although Ms. Walker had access to some information regarding costs from Mr. Disselkoen, and she had the cost estimates on the original contract that were prepared by Mr. Woods,[61] the A & E firm, she did not consult with Mr. Disselkoen or Mr. Woods. Rather, Ms. Walker simply compared M & M's price with G & L's. As Ms. Walker testified, "[n]othing was done beyond that." Ms. Walker stated that she did not believe anything more was required. Ms. Walker testified that under the FAR she had the authority to use any terms and acquisition method she deemed appropriate for the reprocurement. Based on this authority in the FAR, she dispensed with the requirement for an independent government estimate. She also stated that she never asked for nor received any cost and pricing data from M & M or G & L and did not think it was necessary.

Ms. Walker also could not remember why she awarded M & M's contract for $701,068 instead of the $691,471 that had been initially proposed by M & M. She stated that she had not been able to find any documents in the contract file to substantiate the price difference. She indicated that she believed that the price difference may have been associated with Amendment 1 to the solicitation. The amendment added additional work items different from what was required in CJP's contract. Not surprisingly, none of M & M's witnesses could explain the discrepancy between their proposals.

■ There is no question that the FAR gives contracting officers wide discretion in conducting a reprocurement. *See Astro-Space Labs., Inc. v. United States,* 200 Ct.Cl. 282, 308, 470 F.2d 1003, 1017 (1972); *Chemithon Corp. v. United States,* 1 Cl.Ct. 747, 757–58 (1983) (citing *Federal Elec. Corp. v. United States,* 202 Ct.Cl. 1028, 1039, 486

---

60. Mr. Strickler testified that benefits increase the labor costs by 53 or 54 percent.

61. When Mr. Woods was asked to review M & M's two-page bid sheet he testified that he did not believe that it provided a basis for awarding a contract.

F.2d 1377, 1383 (1973)). That discretion is not, however, absolute. *See Astro–Space Labs.*, 200 Ct.Cl. at 308, 470 F.2d at 1017; *see also Matthews Co.*, ASBCA No. 459, 76–2 BCA ¶ 12,164, *recons. denied*, 77–1 BCA ¶ 12,434, 1977 WL 27124.[62] Where, as here, the contracting officer is presented with proposals exceeding the cost of the initial contract, knowing that the gas piping has been completed, the demolition is finished and that 8 of the 24 heating units have been set, her failure to question any of the proposed costs or to seek some review of the proposals was not justified. *See Century Tool Co.*, GSBCA No. 4000, 76–1 BCA ¶ 11,855, 1976 WL 1841. GSA's failure to question costs is linked to its inadequate price negotiation on both the base reprocurement contract of $701,068 and the $423,950 modification for the welding rework. This means that GSA did not do any negotiating on 94% of the total reprocurement cost of $1,193,918.

■ Moreover, the testimony of M & M's and G & L's witnesses simply confirmed Ms. Walker's mistake. Rather than reassuring the court of the "reasonableness" of their proposals, the testimony of Ms. Dove, Mr. Oden, Mr. Mullican, and Mr. Macerollo raised serious concerns about the legitimacy of their proposals. The labor and material costs proposed by M & M were clearly inflated and unsupported.[63] G & L did not even attempt to justify its proposal. In addition, the court finds Mr. Strickler's testimony on the reasonableness of the reprocurement costs particularly unpersuasive. It was not consistent with his earlier testimony and was not based on any analysis or cost review.[64] The court recognizes that it probably would have cost a follow-on contractor somewhat more than it would cost the original contractor to finish another's contract. However, there was no credible evidence presented to support a contract price that was 3–times what GSA's expert's estimated it would have cost a "dedicated" contractor to complete the work.[65] In sum, the court finds that the reprocurement price was not reasonable and therefore, GSA has failed to establish its right to the base reprocurement costs on the base contract.

### 2. PS–2 and Other Modifications

■ GSA's claim for the costs associated with the reprocurement modifications must also be denied. For the reasons stated earlier the court found that the welding did not have to be replaced for failing to meet the terms of CJP's contract with GSA. Accordingly, CJP cannot be responsible for the costs of replacing the welding under M & M's modified contract with GSA. Under the FAR the Government is not entitled to costs arising from "material changes" in the reprocurement specifications that result in "substantial alterations" in the work. *See United States v. Axman*, 234 U.S. 36, 34 S.Ct. 736,

---

**62.** As noted above, CJP contends that G & L was not a responsible bidder and therefore its bid did not provide a lawful basis for comparison. Under the FAR, competition is not required where there are bids from at least two responsible bidders. Mr. Macerollo's testimony regarding whether he could have received the bonding necessary to become "responsible" under the FAR was less than convincing. Accordingly, it does appear that Ms. Walker's reliance on two bids was misplaced. Had Ms. Walker done any price evaluation this may have become clear. This is another example of the poor judgment reflected by GSA in managing the reprocurement.

**63.** Mr. Mullican appears to have had it right when he wrote to his daughter admitting his contract with GSA was a "Gold Mine."

**64.** CJP presented the testimony of its cost expert, Mr. Gunn, who explained, based upon his knowledge of procurement requirements, why M & M's proposal and cost submissions to GSA raised questions that should have been explored by GSA before the contract was awarded and costs paid. Among the concerns he raised, was M & M's failure to support its costs with appropriate documentation and underlying data.

The court found Mr. Gunn's testimony credible and sincere. However, the court has based its conclusions on an independent review of the relevant regulations, as applied to the present facts.

**65.** GSA argues that the reprocurement costs are reasonable, in part, because Mr. Tully's notes show that "even the bonding company's representative ... estimated it might cost 'around $1 million' for another contractor to complete the GSA contract." Mr. Tully explained at trial that his notes reflect what the bonding company was told by GSA's field personnel. There is no reason, therefore, to believe that the bonding company agreed that a $1 million reprocurement price would be "reasonable."

58 L.Ed. 1198 (1914); *Cascade,* 773 F.2d at 293–94. M & M replaced CJP's welds in order to obtain x-ray quality welds consistent with API 1104. CJP was not required to meet that standard. Therefore, the $423,950 associated with meeting PS–2 cannot be charged to CJP. In addition, as the court has previously held, CJP's welds otherwise met the requirements of its contract with GSA and thus did not have to be replaced. Accordingly, CJP is not responsible for the added welding costs.[66]

Further, CJP cannot be reasonably charged for any of M & M's other modifications. GSA's testimony to support CJP's liability for several other modifications to M & M's contract also was not persuasive. GSA was not able to show that the costs associated with the screw piping, meggering of wire, restrapping of conduit, missing fluorescent lights, maintenance of the heating units and boilers, breeching, and brackets were attributable to CJP. Rather, the court was persuaded that it was more likely that M & M caused the problems that led to these modifications when M & M was on site replacing CJP's welds or installing units. It also appeared from M & M's testimony that it was aware of GSA's apparent willingness to reimburse M & M for virtually any problem it encountered, and M & M took advantage of this fact.[67] GSA failed to meet its burden for these costs. Accordingly, the court finds that CJP is not responsible for any of those other costs.

## III. TERMINATION FOR CONVENIENCE

If, after termination, it is determined that the contractor was not in default, or that the default was excusable, the rights and obligations of the parties are the same as if the termination had been issued for the convenience of the Government. *See* 48 C.F.R. § 52.249–10(c) (Apr.1984). CJP's contract incorporated 48 C.F.R. § 52–249–2, titled "Termination for Convenience of the Government (Fixed Price) Alternate I (Over $100 k)."

In accordance with FAR part 52, CJP prepared a termination settlement cost proposal. Mr. Powell prepared this proposal for CJP.[68] At trial Mr. Powell testified that he followed the regulations in FAR part 49 for determining how to cost the proposal. Mr. Powell testified further that the basis of the settlement proposal was CJP's financial statements and its job cost report. Mr. Powell reported to the court that CJP's job cost report was "very detailed" such that "at that point in time, it was probably the best job cost system that I had ever seen for a small contractor." In explaining how Mr. Powell converted the "raw data" from the job cost history into the final figure of $223,914.18,

---

66. The court also finds that even if CJP was required to meet a more stringent welding standard, GSA's decision to remove and replace all of the welds based on eight x-rays tests was not reasonable. At trial, GSA's witnesses, Mr. Palmer and Mr. Walkowiak both stated that had they known the pipeline had been energized without incident and had passed all of the other NFPA tests, they would have called for more testing before they would have recommended that all of the welds be removed. In fact, while Mr. Palmer was highly critical of CJP's welds, he did think that of the 30 he visually examined, one third were fine. In such circumstances, GSA's decision to remove and replace more than 650 welds was premature. Ms. Walker's notes reveal that she was only told that the pipeline could fail at any minute and that further testing was not cost-effective. The court finds that before CJP could be charged with the cost of replacing all of its welds, GSA should have done more testing and consulted with a mechanical engineer, as Mr. Palmer, GSA's expert, suggested.

67. As previously noted, M & M could not support many of these modification costs with cost documentation. For example, with regard to Mod PS–2, the only items M & M submitted to the GSA were the one-page proposal, the "Contract Pricing Proposal Cover Sheet," and a certificate of cost and pricing data, but there was no such data attached. Other than the proposal, cover sheet, and certificate, the only M & M document that existed for the government to review for price reasonableness was Mr. Mullican's one-page, handwritten estimate. Additionally, although Mod AS–16 shows the government paid $4,901 to M & M for equipment start-up, Mr. Gunn testified that there are no invoices indicating that M & M, in turn, paid Hastings. If M & M had paid Hastings any start-up costs pursuant to this modification, M & M's job cost history report would show it. Mr. Gunn found that the job cost history report does not show any start-up costs paid by M & M to any party.

68. Mr. Powell testified that this is some of the type of cost work that he has done all his life.

Mr. Powell stated that he applied FAR part 49, which allows total costs of performance, plus a reasonable profit, plus settlement expenses, less what the contractor has been paid up to that point in time.

Mr. Powell also explained that under FAR part 49, a contractor cannot recoup more than the contract price under a termination settlement except when the contractor is due an equitable adjustment that would increase the contract price. Mr. Powell testified that all of the changes to the contract performed up to the termination are subsumed into the "total cost" figure. Mr. Powell also testified that he followed the rules for unallowable costs in FAR part 49.

Pursuant to Mr. Powell's settlement proposal, CJP requested payment in the following amounts:

| | |
|---|---|
| Costs of performance: | $584,889.18 |
| Settlement Costs | $ 3,645.00 |
| Subtotal Due CJP | $588,534.18 |
| Less Amount Paid | ($364,593) |
| Total Claimed | $223,941.18 |

Mr. Powell did not speculate as to whether CJP was in a loss position in this contract. GSA argued at trial that CJP would have been in a loss position on the contract because CJP had failed to include the cost of the breeching material and labor in its bid. GSA contended and CJP did not disagree that this amounted to approximately $65,000. Given CJP's extremely low bid price, GSA contends that CJP would have suffered a loss if it had paid for the breeching and the labor.

On September 19, 1995, CJP submitted its Termination Settlement Proposal with a separate cover letter informing GSA that CJP

was certifying the proposal as a claim and requesting a Contracting Officer final decision within 60 days. GSA never issued a decision, nor did it refer the settlement proposal for audit as required by regulation. *See* 48 C.F.R. § 49.107 ("The TCO shall refer each prime contractor settlement proposal of $100,000 or more to the appropriate audit agency for review and recommendations.") As a result, the court does not have all the information necessary to make a final determination as to damages.

Therefore, pursuant to the Court's authority under 28 U.S.C. 1491(a)(2) [69] and 41 U.S.C. § 605(c)(5),[70] the present case is remanded to the Contracting Officer to provide an opportunity for her to render a final decision on CJP's Termination Settlement Proposal that is now before the Court on a "deemed denied" basis. The Court shall retain jurisdiction and control over all aspects of the case.

## IV. CONCLUSION

For the foregoing reasons the termination for default shall be converted to a termination for the convenience of the government. The case shall be stayed for 90 days pending a remand to the contracting officer for a decision on CJP's Termination Settlement Proposal.

---

**69.** Section 1491(a)(2) of Title 28 states in relevant part "In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."

**70.** Section 605(c)(5) of Title 41 states:
Any failure by the contracting officer to issue a decision on a contract claim within the period

required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter. However, in the event an appeal or suit is so commenced in the absence of a prior decision by the contracting officer, the tribunal concerned may, at its option, stay the proceedings to obtain a decision on the claim by the contracting officer.